[No. D059985. Fourth Dist., Div. One. Mar. 27, 2012.]

In re JORDAN R. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Appellant, v.
CARLOS R., Defendant and Appellant;
L.R., Defendant and Respondent;
NICHOLAS R., Appellant.

114

**COUNSEL**

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Appellant.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Respondent.

Terence M. Chucas, under appointment by the Court of Appeal, for Appellant.

OPINION

**IRION, J.**—This appeal and cross-appeal concerns two minor children, Jordan R. and Nicholas R., who are the daughter and son of Carlos R. and his wife, L.R. Carlos appeals the juvenile court's findings and orders adjudicating his daughter, Jordan, a dependent of the juvenile court under Welfare and Institutions Code[1] section 300, subdivision (d). The petition alleged Jordan was at risk of sexual abuse because Carlos had sexually abused a niece who was living in the family home. At the jurisdictional hearing Carlos sought to introduce the results of a polygraph examination[2] in which the examiner had concluded that Carlos was truthful when he denied that he had sexually abused his niece, but was precluded from doing so after the juvenile court found that polygraph examination evidence was not generally accepted in the relevant scientific community under *Kelly/Frye*.[3] He contends the juvenile court erred when it excluded the results of his polygraph examination. Carlos also argues the juvenile court's finding that Jordan was at substantial risk of sexual abuse is not supported by substantial evidence.

The San Diego County Health and Human Services Agency (Agency) and the minor child, Nicholas, cross-appeal the juvenile court's finding that Nicholas was not at substantial risk of sexual abuse under section 300, subdivision (d) and challenge the dismissal of the dependency petition filed on his behalf.

---

[1] Unless otherwise indicated, further statutory references are to the Welfare and Institutions Code.

[2] The polygraph is an electrical device that, when attached to a person, registers and charts the person's changes in blood pressure and pulse, respiration, and perspiration while under questioning. The theory of the device is that the subject undergoes emotional excitement when lying and that under skillful questioning by an expert, the examination affords a reliable, though far from conclusive, indication of truthfulness or falsehood. (See 2 Witkin, Cal. Evidence (4th ed. 2000) Demonstrative, Experimental, and Scientific Evidence, § 87, p. 102, citing 1 McCormick, Evidence (5th ed. 1999) § 206, 3A Wigmore, Evidence (Chadbourn rev. 1970) § 999, p. 946, Gianelli Symposium, panel 7, Polygraph Evidence Post-Daubert (1998) 49 Hastings L.J. 895 [admissibility in light of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [125 L.Ed.2d 469, 113 S.Ct. 2786] (*Daubert*)].)

[3] See *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*) and *Frye v. U.S.* (D.C. Cir. 1923) 54 App. D.C. 46 [293 Fed. 1013] (*Frye*). "[T]he *Frye* test was superseded by the adoption of the Federal Rules of Evidence." (*Daubert, supra,* 509 U.S. at p. 587.) Nevertheless, the *Kelly* standard continues to be the law in California. (*People v. Leahy* (1994) 8 Cal.4th 587, 604 [34 Cal.Rptr.2d 663, 882 P.2d 321] (*Leahy*).) Though *Kelly/Frye* remains a popular designation for the doctrine, the name "*Kelly* test" may be more apt. (*People v. Nolan* (2002) 95 Cal.App.4th 1210, 1212, fn. 1 [116 Cal.Rptr.2d 331]; see 2 Witkin, Cal. Evidence, *supra,* Demonstrative, Experimental, and Scientific Evidence, § 42, p. 54.) Consequently, in this opinion we refer to the foundational requirement for scientific evidence as the "*Kelly* rule."

## FACTUAL AND PROCEDURAL BACKGROUND

Carlos R. and L.R. (the R.'s) are the parents of daughter Jordan, now seven years old, and son Nicholas, now age three (together, children). Carlos is employed as an investigator. L.R. works with at-risk teenagers and is a mandatory child abuse reporter. They have no criminal, substance abuse or child protective histories.

S.O., born in early 1997, is the R.'s niece. In November 2010, at her parents' request, Carlos and L.R. took S.O. into their home after she was expelled from school for throwing a chair at the principal. She had exhibited other behavioral problems, including stealing, running away, cutting herself and an attempted suicide. S.O. stayed with the R.'s during the week and returned to her mother's home on weekends.

On January 17, 2011, shortly before she was scheduled to return to the R.'s home for the school week, S.O. alleged that Carlos had sexually abused her. S.O. said that when she arrived at the R.'s, Carlos told her he would teach her to wrestle. At first, Carlos taught her self-defense and other martial arts moves. Occasionally, his hands or arms would "bump into, or lift her breast or buttocks." S.O. believed this contact was accidental. After a few weeks, S.O. said the wrestling began to "get weird." On January 13, after returning home from the gym, S.O. said Carlos showed her pornography on television, asked her for a lap dance and oral sex, which she performed, licked her breasts and genitals, and started to masturbate in front of her. Carlos told her not to tell anyone about their sexual activities.

On January 18, 2011, a detective with the San Diego Police Department (SDPD) asked S.O. to make a pretext call to Carlos. When S.O. said she was not sure she should tell anyone because Carlos had told her not to say anything, Carlos hung up the telephone.[4]

---

[4] The transcription of the conversation reads as follows:
"[S.O.]: Like that day, what happened, did I do anything that like made me sick or anything?
"Carlos: Yeah.
"[S.O.]: Because like my throat like—
"Carlos: Uh, no, no, not at all.
"[S.O.]: 'Cause I don't want to like—it's like my throat that hurts.
"Carlos: No.
"[S.O.]: No?
"Carlos: Do you need clothes or anything? [¶] . . . [¶]
"[S.O.]: No. I got all my clothes right here.
"Carlos: No, 'cause [Nicholas]'s sick and then Jordan . . . . So it's just kinda going around.
"[S.O.]: But, umm, what—what like we like sort of did that day, like nothing like happened—
"Carlos: Yeah.

Carlos was arrested and charged with lewd and lascivious acts with a minor and oral copulation of a minor. He denied sexually abusing S.O.

In February 2011, the Agency filed petitions under section 300, subdivision (d), on behalf of Jordan and Nicholas. The Agency alleged there was a substantial risk that the children would be sexually abused because Carlos had sexually abused S.O. from January 2011 to the present by touching her breasts and buttocks, masturbating in front of her and participating in oral copulation. The Agency further alleged that L.R., the children's mother, was aware of S.O.'s disclosures but did not believe that Carlos had molested her.

Carlos moved out of the family home. The children were detained with L.R.

Social worker Marisol Barragan interviewed Carlos on February 18. She asked him why he did not take a polygraph examination at the police station. Carlos said the police told him they would not release him from custody even if he passed the examination. On March 10, Carlos voluntarily submitted to a private polygraph examination (the polygraph examination).[5] In her report prepared for the jurisdictional and dispositional hearings, Barragan reported that L.R. informed her that Carlos had passed the polygraph examination.

The section 300 hearing was heard on seven days from May 16 to June 19.[6] The juvenile court admitted the Agency's reports and other exhibits in evidence, and heard the testimony of Carlos; L.R.; S.O.; social workers Barragan and James Marcuzzo; Sean Soriano, a criminalist with the SDPD; and others.

In reports admitted in evidence, Barragan reported her interviews with family members. L.R. said Carlos took an interest in helping S.O. In November 2010, L.R. had told Carlos to stop wrestling with S.O. because it was "not appropriate." She was afraid S.O. would get hurt.

Six-year-old Jordan identified the private areas of her body and denied any inappropriate touching. She said her father liked to wrestle. Jordan heard her mother tell her father to stop wrestling with S.O., but they continued to wrestle when L.R. was not at home. Jordan saw Carlos lying on top of S.O.

Carlos acknowledged to Barragan that he wrestled with S.O. Carlos said the wrestling move that Jordan described was called an "arm triangle." Carlos

"[S.O.]:—or anything? 'Cause I don't wanna like—like I should tell someone or—like I'm not sure. Like I was going to call Alesia then, but you told me not to like say anything. Hello? Carlos? Carlos, are you—are you still there? Bye then. Never mind."

[5] The polygraph examination is described in Discussion, part IC., *post.*

[6] A hearing under Evidence Code section 402 concerning the admissibility of the polygraph examination was heard on May 20 and 26.

and L.R. believed that S.O. was motivated to lie about being sexually abused because she wanted to return home, where she was not supervised and could dress in the style of "gang clothing" that she was not permitted to wear while living in their home.

Carlos testified that he met S.O. when she was approximately five years old. Because S.O.'s home life was chaotic, the R.'s often included her in their family vacations and outings. Carlos acknowledged that shortly after S.O. came to live with them, he started wrestling with her. He also wrestled with Jordan and Nicholas. Carlos continued to wrestle with S.O. after L.R. told him to stop. Carlos said S.O. was a gifted athlete and wanted to learn mixed martial arts. He and L.R. believed that S.O.'s participation in athletic activities would help stabilize her. S.O. started going to the gym with Carlos on Tuesday, January 11.

Carlos testified that on Thursday, January 13, he and S.O. returned home from a kickboxing class at approximately 8:45 p.m. Carlos told S.O. to wait before showering because she was overheated. He left to shower. S.O. was watching a movie called The Ring (DreamWorks Distribution 2002). After S.O. showered, she returned to watch the movie. He changed the television channel because there was a bare-breasted woman in the movie. Carlos denied that he asked S.O. questions of a sexual nature or touched her in any way.

L.R. testified she had been involved with S.O. since S.O. was approximately two years old. L.R. asked Carlos to stop wrestling or roughhousing with S.O. L.R. saw Carlos lying on top of S.O. She did not believe that was appropriate behavior with a 13-year-old girl. She told Carlos to stop. Carlos and S.O. continued to practice mixed martial arts moves, karate moves and "ninja warrior kind of stuff" in her presence but did not wrestle or roughhouse.

On January 13, L.R. was sleeping when Carlos and S.O. returned home from the gym. He turned on the bedroom light to get some clothes, kissed her cheek and took a shower. The next morning, everything was normal. S.O. was fine. L.R. did not believe Carlos sexually abused S.O., and she did not believe he presented any risk of sexual abuse to Jordan or Nicholas.

S.O. testified that L.R. was like a mother to her and Carlos was cool and fun. For example, when he refereed at basketball games, he would take her with him. She and Carlos were buddies. She started wrestling with Carlos soon after she arrived at their home. He watched wrestling on television and had a book with moves in it. There was a move in the book where one person was on the ground and the other person was on top. He asked S.O. if she

would like to try that move. They started wrestling from that position. Carlos's body was completely covering her body. Jordan tried to help her and climbed on top of Carlos's back. Carlos pushed Jordan off his back and she started crying. Carlos continued to wrestle with S.O. When S.O. told him Jordan was crying, Carlos kissed S.O. on her neck before he got up. After that incident, Carlos would just grab her and start wrestling. S.O. testified that Carlos wrestled with Jordan all the time. He only wrestled with Nicholas a few times.

S.O. said that on January 13, she and Carlos went to the gym. When they returned home, Carlos told S.O. to relax before she showered because she had had a hard workout. They sat down on the couch. Carlos turned on the television. He changed the channel to a show in which there were two naked girls and a naked guy. Carlos asked S.O. to give him a lap dance. She said "no" but he asked again. She gave him a lap dance and sat back down. She was scared. Carlos showered and returned. S.O. then showered. When she returned, Carlos took her to the garage. He lay down on a floor mat and told S.O. to turn off the light. When S.O. turned off the light, Carlos grabbed her by the leg, pulled her down on top of him and started kissing her. He started pulling down her pants. S.O. put her hand "down by [her] stomach so that way he wouldn't do anything, because he had his shorts down." S.O. felt his penis on her leg.

At some point S.O. and Carlos went back into the house and sat on the couch. Carlos told her that L.R. did not want to have sex with him and he was thinking about getting divorced. S.O. was scared. Carlos pulled down her pants and started licking her genitals. Carlos asked her to suck his penis, which she did. When she was done, her mouth "tasted funny, like weird, like it was gummy." S.O. denied seeing Carlos touch himself anywhere on his body. Before she went to sleep, Carlos asked her not to tell anyone, promised to buy her an android telephone and said he would allow her to have her tongue and eyebrow pierced.

Soriano, an SDPD criminalist, testified that he assisted with a search warrant at the R.'s home on January 19, 2011. He and his colleagues performed extensive testing of the couch, the area around the couch, the mats in the garage and clothing collected from S.O. All presumptive tests had negative results for semen. No semen was found on the victim's sexual assault examination kit.

Social worker Barragan stated she believed that Carlos had planned to sexually abuse S.O. Carlos started wrestling with S.O. when she was eight years old. The wrestling was a grooming behavior for later abuse. Barragan said Carlos's behavior with S.O. when she was young demonstrated there

was a substantial risk of sexual abuse to Jordan and Nicholas. Carlos used wrestling to break down the children's boundaries and intrude into their personal space, as he had done with S.O. Further, Jordan was directly affected when she saw Carlos on top of S.O. Jordan cried and tried to stop what Barragan characterized as a "sexual abuse act[]."

The juvenile court sustained the allegations of the section 300, subdivision (d) petition filed on Jordan's behalf, but found that the Agency had not met its burden to show that Nicholas was at risk of sexual abuse. The court dismissed the section 300 petition filed on behalf of Nicholas, removed Jordan from Carlos's care and custody, and placed her in L.R.'s care under a family maintenance plan.

## DISCUSSION

### I

### *THE ADMISSIBILITY OF POLYGRAPH EXAMINATION*

A. *Overview*

To sustain the allegations under section 300, subdivision (d) that Jordan and Nicholas, then ages six and two years, were at risk of sexual abuse, the Agency had to show by a preponderance of the evidence that Carlos had sexually abused 13-year-old S.O. As we discuss in greater detail below, Carlos sought to introduce the positive results of his polygraph examination in which Carlos denied having sexual contact or oral sex with S.O. The Agency objected to admission of the evidence on the ground that polygraph examination was not generally accepted as a reliable scientific technique by the relevant scientific community. (See *Kelly, supra*, 17 Cal.3d at p. 30.)

After holding a foundational hearing in which it considered scientific literature on polygraph examination submitted by the parties, briefing and oral argument of counsel, and an offer of proof as to the qualifications and proposed testimony of four experts Carlos wished to call at the hearing, the juvenile court ruled that the results of Carlos's polygraph examination were inadmissible because polygraph examination was not generally accepted in the relevant scientific communities of physiology/psychophysiology, psychology or psychiatry under *Kelly*.[7] The juvenile court also held it would not receive additional witness testimony on the issue, including testimony from Carlos's proffered experts, because the taking of such testimony would result

---

[7] There is no dispute in this case as to the relevant scientific communities for purposes of *Kelly* analysis.

in an undue consumption of time when balanced against the probative value of the evidence to the issues before the court. (Evid. Code, § 352.)

On appeal, Carlos contends the juvenile court abused its discretion when it did not allow him to present expert testimony at the foundational hearing on whether polygraph examination was generally accepted in the relevant scientific communities of physiology/psychophysiology, psychology or psychiatry. Specifically, Carlos contends: (1) expert testimony was necessary to demonstrate general acceptance of the reliability of polygraph evidence in the relevant scientific communities; (2) at least one of his four proffered experts had no interest in the polygraph community and should have been allowed to testify at the foundational hearing; (3) the probative value of Carlos's experts' testimony is unknown because the experts were not permitted to testify; (4) the case law relied upon by the court did not reflect the current state of polygraph examination acceptability; and (5) Carlos had a due process right to present expert testimony given that his fundamental rights regarding custody of his children were at issue.

The trial court is vested with broad discretion in ruling on the admissibility of evidence. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 911 [95 Cal.Rptr.3d 62]; *In re S.A.* (2010) 182 Cal.App.4th 1128, 1135 [106 Cal.Rptr.3d 382].) " '[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion.' " (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431 [77 Cal.Rptr.2d 574] (*Tudor Ranches*).) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' " (*Ibid.*)

B.  *Legal Framework*

The admissibility of polygraph evidence has long been an issue in federal and state courts. (*United States v. Scheffer* (1998) 523 U.S. 303, 309–312 [140 L.Ed.2d 413, 118 S.Ct. 1261] (*Scheffer*) [discussing controversy in state and federal courts concerning both the admissibility and reliability of polygraph examination]; *People v. Wilkinson* (2004) 33 Cal.4th 821, 850 [16 Cal.Rptr.3d 420, 94 P.3d 551] (*Wilkinson*) [recognizing "deep division" in scientific and legal community about polygraphy].) In 1983, the California Legislature prohibited the admission of polygraph evidence in criminal proceedings, absent a stipulation by all parties. (Evid. Code, § 351.1, subd. (a),[8] added by Stats. 1983, ch. 202, § 1, p. 667.) However, "[t]he Legislature left open the question of use of a polygraph examination in civil and noncriminal

---

[8] Evidence Code section 351.1, subdivision (a) states: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post conviction

juvenile matters." (*In re Kathleen W.* (1987) 190 Cal.App.3d 68, 72 [235 Cal.Rptr. 205] (*Kathleen W.*); see also *People v. Fields* (2009) 175 Cal.App.4th 1001, 1017 [96 Cal.Rptr.3d 668].)

██ When a party seeks the admission of polygraph evidence at a jurisdictional hearing under section 300, the juvenile court is required to hold a foundational hearing to determine the admissibility of polygraph examination results, if the results of the examination are relevant to the primary issue before the court.[9] (*Kathleen W., supra,* 190 Cal.App.3d at pp. 71, 73.) A foundational hearing allows the trial court "to decide preliminary questions of fact upon which the admissibility of evidence depends." (*People v. Superior Court (Blakely)* (1997) 60 Cal.App.4th 202, 209, fn. 6 [70 Cal.Rptr.2d 388], citing Evid. Code, § 402.) In the hearing the proponent of a new scientific procedure must prove three preliminary facts: (1) that the reliability of the scientific technique is generally accepted by recognized authorities in the scientific field(s) in which the technique belongs; (2) that the witnesses giving expert testimony on the acceptance in the relevant scientific communities are qualified experts on the subject; and (3) that correct scientific procedures were used in administrating the scientific technique. (*People v. Roybal* (1998) 19 Cal.4th 481, 505 [79 Cal.Rptr.2d 487, 966 P.2d 521]; *Kelly, supra,* 17 Cal.3d at p. 30; *In re Sara M.* (1987) 194 Cal.App.3d 585, 592–593 [239 Cal.Rptr. 605]; *Seering v. Department of Social Services* (1987) 194 Cal.App.3d 298, 310 [239 Cal.Rptr. 422] (*Seering*); 2 Witkin, Cal. Evidence, *supra,* Demonstrative, Experimental, and Scientific Evidence, § 42, p. 53.)

██ The *Kelly* requirement of "general acceptance" of a scientific technique means proof of *scientific consensus* drawn from a typical cross-section of the relevant, qualified scientific community. (*Kelly, supra,* 17 Cal.3d at p. 30; see *People v. Shirley* (1982) 31 Cal.3d 18, 55–56 [181 Cal.Rptr. 243, 723 P.2d 1354] (*Shirley*); *Leahy, supra,* 8 Cal.4th at p. 611; Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2011) ¶ 8:565, p. 8C-60 (rev. # 1, 2011).) The test is met if use of the technique is supported by a *clear majority* of the members of the relevant scientific community. (*People v. Guerra* (1984) 37 Cal.3d 385, 418 [208 Cal.Rptr. 162, 690 P.2d 635].) In determining the general acceptance issue, courts must consider the quality, as well as the quantity, of the evidence supporting or opposing the scientific technique. (*Leahy,* at p. 612; *People v. Venegas* (1998) 18 Cal.4th 47, 85 [74 Cal.Rptr.2d 262, 954 P.2d 525].)

motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results."

[9] At a jurisdictional hearing under section 300, except as provided in section 355.1 and California Rules of Court, rule 5.684(c) through (e), the admission and exclusion of evidence shall be pursuant to the rules of evidence established by the Evidence Code and by judicial decision, including the rules relating to the admissibility of evidence under the *Kelly* rule. (§ 701; Cal. Rules of Court, rule 5.684(b); see *Kathleen W., supra,* 190 Cal.App.3d at p. 73.)

Considerations of judicial economy make it impractical to require that the views of a cross-section of the relevant scientific community be presented personally by each scientist testifying in open court. (*Shirley, supra,* 31 Cal.3d at pp. 55–56.) "Accordingly, for this limited purpose scientists have long been permitted to speak to the courts through their published writings in scholarly treatises and journals." (*Id.* at p. 56; see *Leahy, supra,* 8 Cal.4th at p. 611; *Kelly, supra,* 17 Cal.3d at p. 35.) " '[I]f a fair overview of the literature discloses that scientists significant either in number or expertise publicly oppose [the technique] as unreliable, the court may safely conclude there is no such consensus at the present time.' " (*Leahy,* at p. 611, quoting *Shirley,* at p. 56.)

In addition to considering published writings in scholarly treatises and journals, the court may receive the testimony of *disinterested and qualified* experts on the issue of the technique's general acceptance in the relevant scientific community. (*Kelly, supra,* 17 Cal.3d at pp. 24, 30; *Shirley, supra,* 31 Cal.3d at p. 54; *Seering, supra,* 194 Cal.App.3d at pp. 312, 313; Evid. Code, §§ 720, 801.)

A witness qualifying as an expert is *disinterested* if he is not "so personally invested in establishing the technique's acceptance that he might not be objective about disagreements within the relevant scientific community." (*People v. Brown* (1985) 40 Cal.3d 512, 530 [230 Cal.Rptr. 834, 726 P.2d 516] (*Brown*); see *People v. Ashmus* (1991) 54 Cal.3d 932, 972 [2 Cal.Rptr.2d 112, 820 P.2d 214] (*Ashmus*), disapproved on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) Factors such as being a leading proponent of the scientific technique, having a long association with its development and/or promotion, or having a vested career interest in its acceptance in the scientific community are among those that show a lack of impartiality by the expert. (See *Kelly, supra,* 17 Cal.3d at p. 38; *Brown,* at p. 533; *People v. Pizarro* (1992) 10 Cal.App.4th 57, 79–80 [12 Cal.Rptr.2d 436].)

A witness is *qualified* to testify as an expert "if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) *To testify on the general acceptance prong of the* Kelly *test, an expert must have the necessary academic or other qualifications which would enable him to "express a competent opinion on the issue of the general acceptance of [the technique] in the [relevant] scientific community."* (*Kelly, supra,* 17 Cal.3d at pp. 38–39, italics added.) This requirement is not fulfilled by mere evidence that would enable the expert to testify that he personally believes that the challenged procedure is reliable; the court must be able to find from the testimony that the procedure is generally accepted as reliable by

the larger, relevant scientific community. (*Id.* at pp. 38–40 [witness did not have the necessary academic qualifications to express a competent opinion on the issue of the general acceptance of voiceprint technique in the scientific community]; *Brown, supra,* 40 Cal.3d at p. 533 [witnesses' lack of formal training and background in the applicable scientific disciplines made them unqualified to state the view of the relevant scientific community].) "The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement. In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited." (*People v. King* (1968) 266 Cal.App.2d 437, 445 [72 Cal.Rptr. 478] (*King*); see Evid. Code, § 720, subd. (a).) On issues involving the qualification of an expert, courts are given considerable latitude, and their rulings will not be disturbed on appeal unless a manifest abuse of discretion is shown. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1207 [47 Cal.Rptr.2d 800, 906 P.2d 1068] (*Davenport*).)

Having set forth the general legal principles applicable to Carlos's claims of judicial error in the conduct of the *Kelly* foundational hearing, we proceed to address the merits of his claims. We first set forth relevant additional facts.

C. *Facts and Procedural Background of the Polygraph Examination, Evidentiary Offer and* Kelly *Hearing*

On March 10, Carlos submitted to a polygraph examination administered by Paul Redden, a retired SDPD polygraph examiner. Carlos answered "no" to the questions, "Have you ever had any type of sexual contact with [S.O.]?" and "Did you ever have oral sex with [S.O.]?" Redden concluded that Carlos's physiological responses were generally associated with truthfulness. The polygraph data from Carlos's examination was given to SDPD polygraph expert Tim Hall, who blind-scored the test and determined that Carlos's responses to those questions were truthful.

Carlos asked the court to admit the results of his polygraph examination in evidence at the section 300 jurisdictional hearing. The Agency opposed his request, arguing, among other things, that polygraph examinations were not generally accepted in the relevant scientific communities.[10] The juvenile court held a hearing under Evidence Code section 402 on May 20 and 26, 2011, to

---

[10] The Agency acknowledged that polygraph examination was generally accepted in the relevant scientific community involved in the assessment and treatment of convicted sexual offenders, as an investigative tool for law enforcement agencies, and for use in employment screening in some government and private organizations. However, the Agency contested the acceptance of the polygraph in the relevant scientific community as a method to determine the truth or falsity of a single issue for admissibility in judicial proceedings.

consider the admissibility of the polygraph examination results under the *Kelly* criteria.

In the hearing the court received and took judicial notice of numerous scientific articles, abstracts and other material submitted by the parties. In addition to a wide variety of material concerning the use of polygraph examination in postconviction sexual offender treatment,[11] Carlos submitted two articles by James Matte about the validity of a particular type of polygraph technique.[12]

The Agency submitted a report that was written by a distinguished committee of academics representing a wide variety of disciplines and published in 2003 by the National Academy of Sciences. (Nat. Research Council, Com. to Review the Scientific Evidence on the Polygraph, The Polygraph and Lie Detection (Nat. Academies Press 2003) <http://www.nap.edu> [as of Mar. 27, 2012] (the 2003 NAS Report).) In addition, the Agency submitted a paper prepared by the American Psychological Association in 2004, entitled "The Truth About Lie Detectors." (<http://www.apa.org/research/action/polygraph.aspx> [as of Mar. 27, 2012].)[13] Other materials lodged by the Agency with the juvenile court included several scholarly articles by William G. Iacono, Ph.D., whose earlier work was cited by the United States Supreme Court in support of its

---

[11] This material included: New Mexico Sentencing Commission and New Mexico Sex Offender Management Board, Research Overview: Post Conviction Sex Offender Polygraph Testing (Sept. 2004) New Mexico Sex Offender Management Board <http://nmsc.unm.edu/ nmsc_reports/sexoffender/> (as of Mar. 27, 2012); English, *The Containment Approach: An Aggressive Strategy for the Community Management of Adult Sex Offenders* (Mar. & June 1998) volume 4, Nos. 1 and 2, Psychology, Public Policy, and Law, pages 218–235; Hagler, *Polygraph as a Measure of Progress in the Assessment, Treatment and Surveillance of Sex Offenders* (1995) volume 2, No. 2, Sexual Addiction & Compulsivity, pages 98–111; and Colorado Department of Public Safety, Sex Offender Management Board, Standards and Guidelines for the Evaluation, Assessment, Treatment and Supervision of Juveniles Who Have Committed Sexual Offenses (July 2002).

[12] Matte, *Guiding Principles and Benchmarks for The Conduct of Validity Studies of Psychophysiological Veracity Examinations Using the Polygraph* (2010) volume 4, No. 4, European Polygraph, pages 173–198 (criticizing laboratory studies of polygraph examination in mock crime paradigms as opposed to real-life field cases); Matte, *Psychological Structure and Theoretical Concept of the Backster Zone Comparison Technique* (Nov. 2, 2007) volume 36, No. 2, Polygraph, Journal of the American Polygraph Association (discussing the theoretical concept and psychological structure of a particular polygraph technique emphasizing the order and manner in which the test questions are reviewed with the examinee).

[13] In addition to the literature mentioned above, the Agency also submitted scholarly articles that were written prior to the United States Supreme Court's decision in *Scheffer, supra,* 523 U.S. at p. 309 ["[T]here is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques."].) In view of *Scheffer,* those materials are not relevant to the issue whether polygraph examination is *now* generally accepted by the relevant scientific community.

conclusion there was no consensus in the scientific community about the reliability of polygraph evidence.[14] (*Scheffer, supra*, 523 U.S. at p. 333, fns. 21, 22.)

Carlos stated he would show through expert testimony that polygraph examination had gained general acceptance in the fields of physiology/psychophysiology, psychology and psychiatry, especially in the areas of those disciplines devoted to lie detection, and would also show that polygraph examination is a generally scientifically acceptable means of testing a given statement to determine whether the subject believes the statement is truthful. He sought to introduce the testimony of expert witnesses Jim Stam, Redden, Matte and Hall.[15]

Stam was a highly respected, highly considered forensic criminalist who received special training and education in the field of polygraphy from the Criminal Intelligence Division of the United States Army (CID) and other agencies. Stam is now a consultant specializing in crime scene reconstruction, firearms, alcohol/narcotics, trace evidence, gunshot residue and evidence screening. He was the supervising criminalist at the SDPD from 1982 to 2008. At one time he had supervised the polygraph unit. Stam had testified as an expert witness in the fields of alcohol, narcotics, firearms, serology, trace evidence, evidence collection and crime scene reconstruction in other court proceedings. (See, e.g., *People v. Joehnk* (1995) 35 Cal.App.4th 1488, 1495–1496 [42 Cal.Rptr.2d 6] (*Joehnk*).) He had a bachelor of science degree in criminology from the University of California at Berkeley. Carlos stated that Stam, based on his knowledge of research in the field of polygraphy and expertise as a criminalist, would testify that polygraph examination was considered scientifically reliable.

Matte was the owner of Matte Polygraph Services, Inc., and the author of reference works on polygraph validity examination. Carlos said Matte was familiar with all the publications and research about polygraphy, including

---

[14] Iacono, *Forensic "Lie Detection": Procedures Without Scientific Basis* (2001) volume 1, No. 1, Journal of Forensic Psychology Practice, pages 75–86; Iacono, *Effective Policing: Understanding How Polygraph Tests Work and Are Used* (Oct. 2008) volume 35, No. 10, Criminal Justice and Behavior, pages 1295–1308.

[15] On appeal, Carlos does not contest the juvenile court's finding that Redden, Hall and Matte were not disinterested witnesses. He nevertheless contends that the juvenile court should have permitted Matte to testify because he would be subject to cross-examination, but makes no claim as to Redden and Hall. An appellate court can deem an argument waived if it is not supported by analysis or argument in the appellate briefs. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2 [87 Cal.Rptr.2d 654, 981 P.2d 499]; *Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 350 [86 Cal.Rptr.3d 383].) Thus we need not consider whether the juvenile court erroneously excluded Redden's and Hall's testimony on the grounds they were not disinterested expert witnesses. We exercise our discretion to consider the claim as to Matte.

those published within the last five years. He would testify that more than 70 percent of criminalists and psychologists believe that polygraph examination is a reliable procedure for detection in specific event-type cases, as in this case.

Redden owned a private polygraph business and had administered 8,000 polygraph examinations over more than 30 years, including Carlos's examination. Redden had an Associate of Science degree in criminal justice from Sheridan College. He started his career in law enforcement in 1969, and served as a senior SDPD polygraph examiner from 1985 to 2008. Carlos stated that Redden would testify that the comparison method of polygraph examination was proven reliable and was accepted by the scientific community.

Hall was an SDPD polygraph examiner with 12 years of experience. He also taught polygraphy in the private sector. Carlos stated Hall would testify that polygraph examinations of the type performed by the SDPD were deemed reliable in the relevant scientific community.

The juvenile court found that Redden, Matte and Hall had direct interests in the polygraph community, but that Stam was a disinterested witness. Carlos did not proffer any witnesses with appropriate credentials in the fields of physiology/psychophysiology, psychology or psychiatry who would testify that polygraph examination was generally accepted in their scientific communities. The juvenile court further stated there was no literature indicating that doctors who practice in those areas find polygraph examination to be generally acceptable in their field. Other than in the material concerning polygraph examination in postconviction sexual offender cases, the literature showed there was a lack of any general acceptance of polygraph examination in the general scientific or legal communities, and prior case law did not support the general acceptance of the polygraph in the scientific communities on the issue of guilt. Finding that there was significant controversy within the scientific and legal communities concerning the reliability of polygraph examination, the juvenile court determined that the consumption of time involved in taking live testimony would far outweigh its probative value. The court then denied the admission of the results of Carlos's polygraph examination.

We next address Carlos's contentions the juvenile court erred when it relied on the scholarly literature in reaching its conclusions in lieu of live testimony, and abused its discretion when it determined that his proffered witnesses were not disinterested and qualified experts on the issue of the general acceptance of the polygraph examination in the relevant scientific

community.[16] (*Kelly, supra,* 17 Cal.3d at pp. 24, 30; *Shirley, supra,* 31 Cal.3d at p. 54; *Seering, supra,* 194 Cal.App.3d at pp. 312, 313.)

### D. *The Juvenile Court Did Not Err*

#### 1. *The Juvenile Court Did Not Abuse Its Discretion in Relying Solely on the Scientific Literature in Determining General Scientific Consensus*

■ In arguing that the juvenile court abused its discretion when it relied solely on the scientific literature to determine whether the relevant scientific community generally accepts the reliability of polygraph examination, Carlos disregards established case law holding that a court may safely conclude *from the literature alone* that there is no generally accepted scientific consensus about the reliability of the new technique at that time. (*Leahy, supra,* 8 Cal.4th at p. 611; *Shirley, supra,* 31 Cal.3d at p. 56 [if a fair overview of the literature discloses there is significant public opposition to the technique as unreliable, the court may rely on the literature alone to conclude there is no general consensus at the present time]; see *Kelly, supra,* 17 Cal.3d at p. 35 ["Such writings may be considered by courts in evaluating the reliability of new scientific methodology."].) Instead, he relies on dicta in *Joehnk* in which this court stated it is "unwise to rely too heavily on such literature without expert testimony evaluating it and without cross-examination concerning that evaluation." (*Joehnk, supra,* 35 Cal.App.4th at p. 1501.) While it may be preferable for the trial court to hear from disinterested and qualified experts subject to cross-examination in evaluating the scientific literature, *Joehnk* does not hold that the trial court *must* do so or that relying solely on such literature without the assistance of expert testimony constitutes an abuse of discretion.

The scientific literature that was presented to the juvenile court leaves little doubt there is continuing controversy about the reliability of polygraph examination in the relevant scientific community. In 2010, Carlos's proffered

---

[16] The record belies Carlos's argument the juvenile court impermissibly relied on outdated case law in determining that polygraph examination was not generally accepted by the relevant scientific community, and we therefore reject his argument. The juvenile court specifically stated that *it looked for evidence supporting the issue of scientific consensus during the last one to three years.* Further, to the extent the court relied on established case law, it could reasonably limit its review of evidence to the scientific literature concerning the general acceptability of polygraph examination that was published after a court of competent jurisdiction had determined that there was no scientific consensus on the reliability of polygraph evidence at that time. (See, e.g., *Wilkinson, supra,* 33 Cal.4th at p. 850 ["Defendant cannot persuasively contend that between the time of the *Scheffer* decision and defendant's trial, a span of two and one-half years, the deep division in the scientific and legal communities regarding the reliability of polygraph evidence . . . had given way to a general acceptance . . . ."].)

expert Matte wrote "[t]here has been much controversy regarding scientifically accurate and persuasive methods of validating psychophysiological veracity (PV) examination techniques using the polygraph in the identification of guilty and innocent examinees [citations]." (Matte, *Guiding Principles and Benchmarks for The Conduct of Validity Studies of Psychophysiological Veracity Examinations Using the Polygraph, supra,* vol. 4, No. 4, European Polygraph, p. 173.) In 2008, Iacono stated that scientists with no direct involvement in the polygraph profession had reviewed the scientific literature on polygraphs and concluded the accuracy claims were exaggerated. (Iacono, *Effective Policing: Understanding How Polygraph Tests Work and Are Used, supra,* vol. 35, No. 10, Crim. Jus. & Behavior, p. 1302.) A 2004 position paper by the American Psychological Association stated, "Polygraph testing has generated considerable scientific and public controversy. Most psychologists and other scientists agree that there is little basis for the validity of polygraph tests." (Am. Psychol. Assn., *supra, The Truth About Lie Detectors* <http://www.apa.org/research/action/ polygraph.aspx> [as of Mar. 27, 2012].) The 2003 NAS Report, in which a distinguished committee of scientists and other academics conducted a scientific review of the research on polygraph examination pertaining to its validity and reliability, concluded that "[a]lmost a century of research in scientific psychology and physiology provides little basis for the expectation that a polygraph test could have extremely high accuracy." (2003 NAS Rep., *supra* <http://www.nap.edu> [as of Mar. 27, 2012].) The report stated the basic science underlying polygraph examination was not proved, its theoretical underpinnings were weak, past research on polygraph testing was flawed, and there were highly variable factors that undermined confidence in the accuracy of the technique. (*Ibid.*)

Further, the materials Carlos submitted concerning the acceptance of polygraph examination as a treatment tool[17] for convicted sexual offenders do not state that polygraph examination has been accepted by the relevant scientific community as a reliable technique to distinguish between truth and falsehood. (See, e.g., *In re Amber B.* (1987) 191 Cal.App.3d 682, 688 [236 Cal.Rptr. 623] ["rape trauma syndrome" theory was developed as a therapeutic tool, not as a scientifically reliable means to determine the truth of rape allegations].) To the contrary, Carlos's own authorities acknowledge that *the*

---

[17] In the context of postconviction sexual offender treatment, a polygraph examination is used to obtain a lifetime sexual history of the offender as a part of a comprehensive psychosexual evaluation, to monitor compliance with treatment and supervision requirements, and to focus on a specific allegation or behavior. Although the use of polygraph examination as a psychological aid in that context appears to be accepted in many jurisdictions, the literature distinguishes between a clinical polygraph examination and the more traditional specific issue testing. (See, e.g., English, *The Containment Approach: An Aggressive Strategy for the Community Management of Adult Sex Offenders, supra,* vol. 4, Nos. 1 & 2, Psychol., Pub. Pol'y, & Law, pp. 228–230.)

*scientific community continues to question the validity and reliability studies of that type of polygraph examination.* (Hagler, *Polygraph as a Measure of Progress in the Assessment, Treatment and Surveillance of Sex Offenders, supra,* vol. 2, No. 2, Sexual Addiction & Compulsivity, p. 99 ["Unfortunately, specific issue testing is not an infallible determinant of a person's truthfulness. Validity and reliability studies of polygraph techniques are perpetually questioned by members of the scientific community."].)

We conclude that the juvenile court reasonably relied on the scientific literature in reaching its conclusion there was significant controversy within the relevant scientific community about the reliability of polygraph examination at the present time.

### 2. *The Juvenile Court Did Not Abuse Its Discretion When It Excluded Matte's Testimony*

Under *Kelly,* the court may receive the testimony of *disinterested and qualified* experts on the issue of the technique's general acceptance in the relevant scientific community. (*Kelly, supra,* 17 Cal.3d at pp. 24, 30; *Shirley, supra,* 31 Cal.3d at p. 54; *Seering, supra,* 194 Cal.App.3d at pp. 312, 313.) A *qualified* witness has the necessary special knowledge, skill, experience, training, or education in the applicable scientific disciplines to express a competent opinion on the issue of the general acceptance of the technique in the relevant scientific community. (*Brown, supra,* 40 Cal.3d at p. 533; *Kelly,* at pp. 38–39.) A witness qualifying as an expert is *disinterested* if he is not "so personally invested in establishing the technique's acceptance that he might not be objective about disagreements within the relevant scientific community." (*Brown,* at p. 530.)

Here, the juvenile court found that Matte was not a disinterested witness. Carlos does not contest this finding on appeal. Instead, he argues the court should have permitted Matte to testify because he would be subject to cross-examination and the Agency could present opposing evidence. (*Joehnk, supra,* 35 Cal.App.4th at p. 1506.) In *Joehnk,* this court upheld the trial court's finding that the relevant scientific community accepted horizontal gaze nystagmus testing (HGN testing) as a factor in determining sobriety. The court stated it did not have any reservations about the testimony of an expert witness who was a longtime proponent of HGN testing because that witness had been fully cross-examined and the defense was able to present evidence in opposition to her opinions. (*Id.* at pp. 1505–1506.) Thus, *Joehnk* does not stand for the proposition that a trial court must allow a witness to testify when it has determined that the expert is not a disinterested witness. (See *Brown, supra,* 40 Cal.3d at p. 530; *Ashmus, supra,* 54 Cal.3d at p. 972.)

The record shows that the juvenile court did not abuse its discretion when it determined that Matte was not a disinterested witness. Matte owned a polygraph service and was a leading proponent of polygraphy. This situation closely parallels that of the expert witness rejected in *Kelly*, who may have been "too closely identified with the endorsement of [the new scientific technique] to assess fairly and impartially the nature and extent of any opposing scientific views." (*Kelly, supra,* 17 Cal.3d at p. 38; see *King, supra,* 266 Cal.App.2d at p. 458 ["Before a technique or process is generally accepted in the scientific community, self-serving opinions should not be received which invade the province of the trier of fact."].) Although we may have not made the same decision about Matte's testimony, on this record we cannot conclude that the juvenile court abused its considerable discretion when it determined that Matte was not a disinterested witness and excluded his testimony. (*Davenport, supra,* 11 Cal.4th at p. 1207.)

3. *The Juvenile Court Did Not Abuse Its Discretion When It Did Not Allow Stam's Testimony*

Carlos argues the juvenile court erred when it did not qualify Stam to testify as an expert on the issue of the general acceptance of polygraph examination by the relevant scientific community. He contends that Stam testified as an expert witness in the *Joehnk* case and was a highly respected and qualified criminologist. (*Joehnk, supra,* 35 Cal.App.4th at pp. 1495–1496.) "In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited." (*King, supra,* 266 Cal.App.2d at p. 445; see Evid. Code, § 720, subd. (a).)

Despite Stam's impressive experience as a criminalist, the juvenile court did not abuse its discretion when it determined that Stam was not qualified to give his opinion on whether polygraph examination was generally accepted as reliable in the relevant scientific communities of physiology/psychophysiology, psychology or psychiatry. (*Seering, supra,* 194 Cal.App.3d at p. 311.) The subject matter of Stam's testimony in *Joehnk* concerned the reliability of HGN testing as a factor in determining alcohol intoxication. In that case, the record showed that Stam had been involved in more than 30 studies on alcohol ingestion and impaired performance and kept current with the literature in that field. (*Joehnk, supra,* 35 Cal.App.4th at p. 1495.) There is no comparable showing in this case. Here, the record does not show that Stam had participated in any scientific studies concerning the reliability of polygraph examination or that he had any expertise in the fields of physiology/psychophysiology, psychology or psychiatry. Stam's academic

training and experience was that of a criminologist.[18] The juvenile court could reasonably conclude that Stam did not have the necessary qualifications to express an opinion on the question of general scientific acceptance of polygraphy. (*Brown, supra,* 40 Cal.3d at p. 533 [witness must have necessary academic qualifications and background in the applicable disciplines to express an opinion on the question of general acceptance by the relevant scientific communities]; *Kelly, supra,* 17 Cal.3d at pp. 38–40 [although a proffered witness may have demonstrably wide technical experience in the new technology, that witness may not necessarily be qualified as a scientist to express an opinion on general scientific consensus].)

Further, Carlos's offer of proof was insufficient to establish that Stam would testify on the issue of the general acceptance of polygraph examination by the relevant scientific community. Carlos stated only that Stam would give his expert opinion as a criminalist that polygraph examination was now scientifically reliable and considered reliable by others, and would testify that the SDPD polygraphy unit, under his direction, had made significant improvements in quality control in response to the criticism of polygraph examination in the 2003 NAS report. (*Kelly, supra,* 17 Cal.3d at pp. 38–40 [personal belief in the reliability of the new technique is not sufficient to qualify a witness to express an opinion on general scientific consensus].) However, the issue before the court was not whether Stam or others believed that polygraph examination was reliable, but whether the technique was generally accepted as reliable in the relevant scientific fields of physiology/psychophysiology, psychology or psychiatry to determine truth or falsity. (*Seering, supra,* 194 Cal.App.3d at p. 311.) Stam's proposed testimony about his management of the SDPD polygraphy unit was clearly not relevant to that issue.

Although we may not have made the same decision concerning Stam's qualification to render his opinion on the issue of scientific consensus on polygraph examination as the juvenile court did here, Carlos does not show the juvenile court abused its discretion when it determined that Stam was not qualified to testify on that issue. (*Davenport, supra,* 11 Cal.4th at p. 1207 [on issues involving an expert's qualification, courts are given considerable latitude, and their rulings will not be disturbed on appeal unless a manifest abuse of discretion is shown].)

Because the juvenile court did not abuse its discretion in determining the proffered witnesses were not disinterested and/or qualified to give their

---

[18] In his curriculum vitae, Stam stated he had 36 years' experience in general criminalistics in the areas of crime scene reconstruction, firearms, alcohol/narcotics, trace evidence, gunshot residue and evidence screening.

opinions on the issue of general scientific acceptance of polygraph examination by the relevant scientific community, it follows that the probative value of the witnesses' testimony would be outweighed by the undue consumption of time. (Evid. Code, § 352.) We now turn to Carlos's argument the juvenile court violated his due process rights to present witnesses to testify on his behalf.

### E.   *Carlos's Due Process Rights Were Not Violated*

■    The due process right to present evidence is limited to relevant evidence of significant probative value to the issues before the court. (*People v. Marshall* (1996) 13 Cal.4th 799, 836 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *In re J.F.* (2011) 196 Cal.App.4th 321, 335 [126 Cal.Rptr.3d 108].) "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].) "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." (*Scheffer, supra*, 523 U.S. at p. 308.) "A polygraph is not so crucial that its absence precludes a defendant from mounting a defense. A defendant can still testify; he can still present corroborating witnesses; he can still cross-examine hostile witnesses." (*In re Aontae D.* (1994) 25 Cal.App.4th 167, 175 [30 Cal.Rptr.2d 176] (*Aontae D.*); see generally *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1013 [61 Cal.Rptr.3d 403] (*Valerie A.*) [no violation of due process where parent was provided opportunity to present witnesses and cross-examine the social worker].) Thus, "due process does not require the admissibility of *all* evidence which may tend to exonerate the defendant." (*Aontae D.*, at p. 174.)

Here, the exclusion of the evidence concerning Carlos's polygraph examination did not abridge his right to present a defense and thus did not violate his due process rights. Carlos was not prevented from presenting the relevant details of his case from his perspective or from introducing any factual evidence. (*Wilkinson, supra*, 33 Cal.4th at p. 852, citing *Scheffer, supra*, 523 U.S. at p. 317; *People v. Espinoza* (1992) 3 Cal.4th 806, 818 [12 Cal.Rptr.2d 682, 838 P.2d 204] [defendant was not foreclosed from effectively challenging the prosecution's case or from presenting crucial exculpatory evidence].) Further, Carlos did not show that the proffered evidence was reliable. (See *Scheffer*, at p. 309 [governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in court].) Thus, the exclusion of the witnesses' testimony on the grounds they were not disinterested and qualified experts on the general acceptance of polygraph examination in the scientific community did not violate Carlos's due process rights to present evidence at the jurisdictional hearing.

F. *Error, If Any, Is Harmless*

The *Chapman*[19] harmless error standard applies in juvenile dependency proceedings where the error is of constitutional dimension. (*In re Mark A.* (2007) 156 Cal.App.4th 1124, 1146 [68 Cal.Rptr.3d 106] (*Mark A.*).)[20] In protecting his fundamental rights to parent his children, Carlos had the opportunity to present his case and cross-examine the Agency's witnesses, including S.O. (*Valerie A., supra,* 152 Cal.App.4th at p. 1013.) The court's jurisdictional determination rested on its evaluation of the credibility of the witnesses, and it could reasonably place more credence on what it saw and heard in a court of law than on an expert's opinion that the subject of a polygraph examination truthfully answered two questions. (*People v. Rios* (1985) 163 Cal.App.3d 852, 862 [210 Cal.Rptr. 271] [confrontation in court ensures reliability by means of oath, exposes the witness to cross-examination and permits the trier of fact to weigh the demeanor of the witness]; see *Scheffer, supra,* 523 U.S. at p. 313 [a fundamental premise of our criminal trial system is that " 'the jury is the lie detector' "; determining the weight and credibility of the evidence belongs to the finder of fact (italics omitted)].) Further, information about Carlos's positive polygraph examination was contained in the Agency's jurisdiction and disposition report, which was admitted in evidence without objection or redaction. Thus, we conclude that error, if any, is harmless.

To the extent an alleged error violates state evidentiary law, "even where evidence is improperly excluded, the error is not reversible unless ' "it is reasonably probable a result more favorable to the appellant would have been reached absent the error." ' " (*Tudor Ranches, supra,* 65 Cal.App.4th at pp. 1431–1432, quoting *Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1013 [62 Cal.Rptr.2d 164]; *People v. Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].) Here, Carlos cannot show that the results of the jurisdictional hearing would have been more favorable to him had the juvenile court admitted the results of his polygraph examination in evidence. The polygraph examination was offered to enhance Carlos's credibility; it was not binding on the court's determination of the witnesses' credibility. (*Aontae D., supra,* 25 Cal.App.4th at pp. 175–176 [rejecting argument that polygraph evidence was crucial exculpatory evidence].) At most, it would merely have been one factor in the totality of the evidence presented. The juvenile court heard Carlos and S.O.'s

---

[19] *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (before a federal constitutional error can be held harmless, the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt).

[20] Again, we reject the Agency's contention the appropriate standard for review of federal constitutional violations in dependency cases is whether the error is harmless by clear and convincing evidence. (*In re J.F., supra,* 196 Cal.App.4th at p. 336, fn. 6; *Mark A., supra,* 156 Cal.App.4th at p. 1145 [heightened scrutiny of any violation of rights guaranteed under the Constitution is appropriate and is not lessened in dependency proceedings].)

testimony. It believed S.O.'s testimony. Thus, Carlos cannot show that he was prejudiced by the exclusion of the polygraph evidence.

Having determined the juvenile court did not err in excluding expert testimony in the foundational hearing on the admissibility of Carlos's polygraph examination, we now examine Carlos's claim that substantial evidence does not support the juvenile court's finding that Jordan was at substantial risk of sexual abuse under section 300, subdivision (d).

II

*SECTION 300, SUBDIVISION (D)*

A.  *Legal Framework*

At the time of the jurisdiction hearing, the court considers only the question whether the child is described by one or more subdivisions in section 300. Under section 300, subdivision (d), the Agency must show that the child has been sexually abused, or that there is a substantial risk the child will be sexually abused, as defined in Penal Code section 11165.1, by his or her parent, or the parent has failed to adequately protect the child from sexual abuse when the parent knew or reasonably should have known the child was in danger of sexual abuse. The Agency has the burden of proving by a preponderance of the evidence that a child is a person described by section 300. (§ 355, subd. (a).)

Penal Code section 11165.1, subdivision (b)(4) defines " 'sexual assault' " to include "[t]he intentional touching of the genitals or intimate parts (including the breasts, genital area, groin, inner thighs, and buttocks) or the clothing covering them, of a child, or of the perpetrator by a child, for purposes of sexual arousal or gratification, except that, it does not include acts which may reasonably be construed to be normal caretaker responsibilities; interactions with, or demonstrations of affection for, the child; or acts performed for a valid medical purpose." Penal Code section 11165.1 also includes child molestation under Penal Code section 647.6, which makes it a crime to annoy or molest any child under 18 years of age. (See *People v. Kongs* (1994) 30 Cal.App.4th 1741, 1749 [37 Cal.Rptr.2d 327] (*Kongs*) [" 'Annoy and molest' are synonymous and mean to disturb or irritate, especially by continued or repeated acts; to vex, to trouble; to irk; or to offend."].)

We review the trial court's findings to determine whether there is substantial evidence in the record that supports the findings. We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts.

The appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 [33 Cal.Rptr.3d 337].) We draw all legitimate and reasonable inferences in support of the judgment. (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 408 [122 Cal.Rptr.3d 53] (*Candari*).)

B.    *There Is Substantial Evidence to Support the Juvenile Court's Finding That Jordan Is a Child Described by Section 300, Subdivision (d)*

The juvenile court concluded that S.O. was credible when she testified that on January 13, 2011, Carlos made comments of a sexual nature to her, asked her for a lap dance and oral sex, and licked and touched her genitals and breasts. To the extent the trial court's findings rest on an evaluation of credibility, the findings should be regarded as *conclusive* on appeal. (*Estate of Fries* (1965) 238 Cal.App.2d 558, 561 [47 Cal.Rptr. 888].) To warrant rejection of the statements of a witness who has been believed by the trier of fact, it must be physically impossible for the statements to be true, or their falsity must be apparent without resorting to inferences or deductions. (*People v. Friend* (2009) 47 Cal.4th 1, 41 [97 Cal.Rptr.3d 1, 211 P.3d 520] (*Friend*).) Carlos does not meet that standard here.

The record shows that although Carlos denied sexually abusing S.O., his testimony concerning the sequence of events on the evening of January 13 tended to corroborate aspects of S.O.'s testimony. He and S.O. returned from the gym, sat together on the couch, and watched a movie in which there was nudity. Carlos showered and returned to the living room, and then S.O. showered and returned to the living room. Carlos does not present with an alibi or show that another person was present with them at the time of the alleged molests. Thus it is not physically impossible for S.O.'s allegations of sexual abuse to be true. (*Friend, supra,* 47 Cal.4th at p. 41.)

The juvenile court also found that Carlos hung up on S.O. during the pretext telephone call, and considered his lack of response to her as an adoptive admission under Evidence Code section 1221. The record shows that during the telephone call, Carlos did not deny or refute the statements that he and S.O. had oral sex and asked her not to tell anyone about it. We draw all legitimate and reasonable inferences in support of the judgment. (*Candari, supra,* 193 Cal.App.4th at p. 408.) The juvenile court could reasonably conclude that Carlos, by not denying the truth of S.O.'s statements, manifested his belief in their truth. (Evid. Code, § 1221.)

Carlos contends the lack of physical evidence undermines the validity of S.O.'s allegations. He points to S.O.'s statements that her mouth felt

"gummy," suggesting Carlos had ejaculated. The court stated it was not concerned by the lack of forensic evidence because there was no credible evidence of ejaculation. We draw all reasonable inferences in favor of the judgment. The record shows that S.O. said she never had a previous sexual experience with a man, and did not know for certain whether Carlos ejaculated. The court could reasonably conclude the lack of physical evidence was not determinative on the issue whether Carlos sexually abused S.O.

Further, is not necessary to find that Carlos had oral sex with S.O. in order to affirm the jurisdictional findings under section 300, subdivision (d) on review. The juvenile court found that Carlos's habit of wrestling with S.O., particularly the incident when he laid on top on her, exceeded all normal boundaries that should be in place when dealing with a 13-year-old girl, or a girl of Jordan's age. The record shows that Carlos acknowledged he wrestled with S.O. and continued to wrestle with her after his wife told him it was not appropriate and asked him to stop. S.O. acknowledged that in the beginning Carlos would teach her self-defense and other martial arts moves; however, she said wrestling with Carlos "g[o]t weird" when he began to lie on top of her and hold her buttocks. He also touched her breasts. The court could draw the reasonable inference that Carlos's inappropriate touching of S.O.'s breasts and buttocks while wrestling, and laying on top of her, annoyed or molested S.O. and violated Penal Code section 647.6. (See *Kongs, supra*, 30 Cal.App.4th at p. 1749.)

Based on Jordan's age, and Carlos's pattern of wrestling with her, the court found that there was a substantial risk that Jordan would be sexually molested. Social worker Barragan said Carlos's pattern of wrestling with Jordan mimicked his pattern of wrestling with S.O., which began when S.O. was approximately eight years old. Jordan often slept with her parents in their bed, increasing Carlos's access to her. In view of Jordan's sex and age, we conclude there is substantial evidence to support the finding that Jordan was at substantial risk of sexual abuse by Carlos. (§ 300, subd. (d).)

## III

### CROSS-APPEAL

The Agency and Nicholas contend the juvenile court abused its discretion when it did not sustain the petition filed under section 300, subdivision (d) on Nicholas's behalf. They argue the evidence supporting the finding Jordan was at substantial risk of sexual abuse supports the same finding as to Nicholas. They contend there is no substantial evidence to support the court's finding that Nicholas was not at substantial risk of sexual abuse. We disagree.

It is not the function of the appellate court to redetermine the facts. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 200 [23 Cal.Rptr.2d 482].) Absent evidence no reasonable trier of fact could have rejected, we must affirm the juvenile court's determination the Agency did not meet its burden of proof to show that Nicholas was at substantial risk of sexual abuse. (*Ibid.*)

The juvenile court rejected the argument that a perpetrator of sexual abuse presents a risk of abuse to all children, characterizing that view as "an overreaction." The court said that S.O. had characterized some of the wrestling as "normal wrestling moves" and found that there was no evidence to show that any of the sexual acts occurred while Nicholas was present. The court further found that there was no credible evidence to suggest Carlos had any interest in sexually molesting young boys, and dismissed the petition filed on Nicholas's behalf.

■ As the juvenile court noted, there is no evidence in the record to suggest Carlos inappropriately touched Nicholas or another male in a sexual manner. (See *In re Maria R.* (2010) 185 Cal.App.4th 48, 68 [109 Cal.Rptr.3d 882] [sexual abuse of a female child, as aberrant as it is, does not establish, in and of itself, that a male child is at substantial risk of sexual abuse].) The record also supports the court's conclusion that there is no evidence to show that Nicholas was present during a sexual act committed by Carlos. The testimony of S.O., L.R., Carlos and Carlos's mother and aunt supports the contention that many of Carlos's wrestling moves were legitimate, and he had maintained a long-standing interest in mixed martial arts. The court could reasonably reject social worker Barragan's theory that Nicholas was at risk of sexual abuse because same-sex sexual abuse often starts with a physical activity like wrestling or other contact sports, and Carlos wrestled with Nicholas. The premise that same-sex sexual abuse may start with contact sports does not compel the conclusion that Nicholas was at risk of sexual abuse.[21] The court reasonably distinguished between Carlos's inappropriate contact with S.O. during some of their wrestling activities and his appropriate physical contact with others with whom he wrestled, including two-year-old Nicholas.

In determining whether Nicholas was described by section 300, the court could also reasonably consider L.R.'s knowledge of child safety and welfare, her status as a mandatory reporter and her full compliance with the Agency's safety plan. The record does not reveal any other risk factors in the home such as substance abuse, domestic violence or previous criminal history that

---

[21] We note that wrestling is a legitimate high school, collegiate and Olympic sport. (See, e.g., College Sports Scholarships, Wrestling History <www.collegesportsscholarships.com/history-wrestling.htm> [as of Mar. 27, 2012] ["Wrestling is one of the few sports that can be traced back to the beginnings of recorded history."].)

might impair L.R.'s ability to maintain a safe home for Nicholas, or warrant a dependency finding under section 300, subdivision (b). (See *In re Maria R., supra*, 185 Cal.App.4th at p. 69 [discussing risk factors other than sexual abuse that would sustain a jurisdictional finding under § 300, subd. (j)].)

We affirm the juvenile court's finding the Agency did not meet its burden of proof to show that Nicholas was at substantial risk of being sexually abused. (*In re Sheila B., supra*, 19 Cal.App.4th at p. 200.) The court did not err when it dismissed the petition filed on Nicholas's behalf under section 300, subdivision (d).

### DISPOSITION

The findings and orders are affirmed.

McDonald, Acting P. J., and Aaron, J., concurred.