Filed 12/23/13  In re A.R. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.R., et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B245594<br>(Los Angeles County<br> Super. Ct. No. CK95473) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARMANDO R.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jacqueline H. Lewis, Juvenile Court Commissioner.  Affirmed.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Melinda A. Green, Associate County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

Father, Armando R., appeals from a court order sustaining dependency jurisdiction over his two boys, A., age eight, and G., age five, under Welfare and Institutions Code section 300.[1] He contends that substantial evidence does not support the dependency jurisdiction allegations. He further contends that there was insufficient evidence of substantial danger to the boys to support the dispositional orders removing them from his care and requiring his visits to be monitored. We disagree and affirm the order sustaining jurisdiction and the disposition order.

# FACTUAL AND PROCEDURAL BACKGROUND

A section 300 petition was filed with respect to the boys alleging jurisdiction under subdivisions (b), (d), and (j), based on allegations that Father sexually abused them. Jurisdiction was also alleged under subdivisions (a) and (b) due to Father's violent behavior towards Mother in the boys' presence and under subdivision (b) based on Father's history of alcohol abuse. Because we affirm the dependency court's finding of jurisdiction on the basis of sexual abuse, we need not consider whether substantial evidence also supported the finding of jurisdiction based on the alleged domestic violence perpetrated by Father against Mother or Father's alcohol abuse. As such, below we recount only the factual allegations relevant to the finding that Father sexually abused the boys.

*Detention*

Mother and Father, who were never married, have not been a couple since 2010, when Mother was hospitalized after a domestic violence incident between

---

[1] All further references to code sections are to the Welfare and Institutions Code.

them.  At all times, the boys have resided with Mother, but at the time the allegations were made they recently had begun having overnight weekend visits with Father.

On August 10, 2012, the Department of Children and Family Services (DCFS) received a child abuse referral alleging that Father had sexually abused A.  The referral indicated that A. complained of pain in his penis and stated that Father touched his penis a lot.  When Mother asked A. how Father touched his penis, he put his hand on his penis and wiggled it.  The children had last visited with Father the weekend of July 27, 2012, and Mother did not allow the children to visit with Father the following weekend.

On August 10, 2012, a DCFS caseworker interviewed A., who stated that Father had touched him on his penis on several occasions at Father's home in Anaheim.  A. stated that Father would "wiggle his wee wee and rub it up and down."  When the caseworker asked more probing questions about this, A. asked, "Are you trying to get my daddy in trouble?", and "Is my daddy going to go to jail?"  A. then stated, "I'm going to stop talking to you because I don't want to get my daddy in trouble."

That same day, the caseworker interviewed G., with A. present because G. was not comfortable being interviewed alone.  G. stated that Father had touched him a few times on his penis and on his buttocks at Father's apartment.  When the caseworker tried to get more details, however, A. interrupted and said, "Stop, G., you're going to get our daddy in trouble."  At that point, G. would not say anything further.

On August 14, 2012, the boys were interviewed by the Orange County Child Abuse Service Team (CAST), which determined that they were not victims of sexual abuse.  On August 16, 2012, Detective Tom Hong from the Orange County

3

Police Department informed DCFS that CAST had determined that Father was merely helping the children clean themselves, and CAST had "scolded the mother for involving the children in the parents' affair."

On August 27, 2012, forensic examinations were conducted on A. and G. The report from A.'s examination includes Mother's statement that A. told her he felt like dying when Father "does that to me." In addition, Mother reported that she had confronted Father about the abuse and asked him, "Why didn't you stop?", and Father replied, "He didn't tell me to stop." Mother reported that A. felt ashamed and fearful of Father, and had been withdrawn, aggressive, and angry. He had been having nightmares that he was dying and believed someone was going to kill him. He had also been pulling his brother's pants down and kissing him on the mouth, and obsessively wanting to shower. G. reported during his examination that his brother tried to look at his "wiener" and his "butt." Normal genital examinations were reported for both A. and G.

On August 31, 2012, Mother filed and received a temporary restraining order against Father, protecting herself and the boys and prohibiting visitation with the boys. The narrative stated in relevant part that A. disclosed Father's sexual abuse to Mother on August 1, 2012, stating that when he visits Father's home, Father "wiggles, rubs and plays with his privates." Mother stated that she reported the abuse to the Anaheim Police Department, but after CAST questioned A, Mother was told the case would be closed. The narrative also indicated that Mother had taken her son to Whittier Presbyterian Hospital to be examined, at which point DCFS was called and the investigation begun. The narrative further stated that on August 3, 2012, Father showed up drunk at the maternal grandmother's house and demanded that Mother give him the children. She told

4

him she would not do so now that she knew what he had done to A. At first he denied touching A. but then said, "Well, he never told me to stop."

A police report by Anaheim Police Officer Kyle Bernard, dated August 7, 2012, stated that according to Mother, A. began complaining on August 1, 2012 about pain in his penis, and said Father touched his penis and moved it back and forth. A. reportedly told Father to stop, but he did not. Mother asked A. how many times this had happened and he said a few times, including when he got out of the shower. Officer Bernard spoke with A., who was very nervous and said he did not want anything bad to happen to his daddy. He eventually said that Father touched his penis area one time a few days ago when he had just finished going to the bathroom and was pulling up his pants. He said he told Father to stop touching his private parts and Father finally stopped. He said Father had not touched any other place on his body.

On August 28, 2012, the DCFS caseworker interviewed Father, who was cooperative throughout the interview. He denied touching the boys inappropriately.

At the detention hearing on September 14, 2012, the dependency court detained the children from Father.

*Jurisdiction/Disposition Report*

A dependency investigator interviewed Mother on October 2, 2012. Mother told the investigator that on August 1, 2012, A. "told me he was going to take a shower. He was going to use the restroom and his attitude was aggressive. He had been having tantrums for a couple months, wanting to sleep in my bed, and his brother G. was starting to wet himself. He said, 'My privates hurt.' I asked him, 'Why does it hurt? Does it hurt when you go pee?' He said, 'No.' I asked him,

5

'Are you playing with yourself?' He said, 'No.' I asked him, 'Are you cleaning your private area?' He said, 'Yeah.' I asked him, 'Is anybody hurting you there?' He said, 'Daddy hurt me there. Daddy plays with my privates. He wriggles my privates.' I asked him, 'Was he helping you during your bath?' He said, 'No.' I tried to call his dad and his dad said, 'Fuck you, you crazy bitch.' He said that I was out of my head. I hung up."

On August 5, 2012, Father showed up at the maternal grandmother's house. Mother stated, "He was drunk and getting in my face. My son had told me what happened with his dad and I wanted to talk about it. He started cussing me out. I told him to talk about it, that 'Chito [A.'s nickname] told me what you did.' He denied it. I asked him, 'What do you have to see a kid's privates for? He said, 'I didn't.' I asked him, 'Why didn't you stop?' That's when he told me, 'He never told me to stop.' I told him I'm calling the cops on him." Mother also shared that A. told his maternal aunt that Father "showed pictures of boobs to us."

With respect to G., Mother stated that he had not told her anything about being touched, but when she took him to Pacific Clinics for an intake for counseling, he told the therapist that Father touches his privates. When asked for the name of the therapist, Mother stated that she had since taken a leave of absence. Mother stated that G. had been having nightmares and in his sleep said, "I don't want to die."

The dependency investigator interviewed Father on October 4, 2012. He denied the abuse and said that when he went looking for Mother at the maternal grandmother's house, he told her to stop making those accusations. He began to cry and said that all that Mother was saying was not true, that he had a normal life, and that he was willing to cooperate with the investigation because he did not do it. Father said he did not touch A.'s penis in any context, such as bathing or dressing,

6

because A. was old enough to bathe himself. He stated that he assisted G. because he was only five and still a baby, and thus he sometimes scrubbed him with a bath sponge and helped him clean his privates. He stated that the bathroom door was always open and visible from the living room, in an apartment he shares with his girlfriend and her two children.

A. and G.'s maternal aunt, Lorena V., told the investigator that in September 2012, A. was using her cell phone to play games. When she tried to take it from him he resisted; when she finally retrieved the phone, he told her that "all this sex stuff started just popping up." The aunt checked the history on the phone and saw that A. had typed "sex" as a search term on the YouTube website. He stated that his cousins (who were 4 and 5 years old) were looking at it, but when the aunt said she would talk to them about that, A. said, "No. No. No. Okay. Okay. I lied. My dad was looking at that. He showed me boobs and sex on YouTube."

*Adjudication*

At the adjudication hearing on October 26, 2012, the court admitted into evidence the detention report with attachments, and the jurisdiction/disposition report, with attachments. A., G., Mother, and Father's girlfriend were called by Father to testify.

A., who was eight years old at the time of his testimony, was able to differentiate true statements from false ones. In relevant part, he testified that sometimes he had taken a shower at Father's house and Father would help him dry off, but Father did not touch his private area while drying him off. He said Father helped him wash his privates when he was young, but not when he got bigger. He stated that when he was seven years old, Father had touched his privates in the living room and in Father's bedroom. The first time, he and G. were in the living

7

room with Father, and Father grabbed A.'s privates over his pants. He asked Father to stop, because it hurt. He stated they were not playing a game, and Father had done it on purpose, not by accident.

The second time Father touched his privates he and G. were again in the living room and Father grabbed his private area over his clothes. Father held it for just "one minute" and wiggled it. He denied that they were wrestling or that Father touched his privates on accident.

A. said Father had touched his private parts "like, eleven times." Usually it happened in the living room, but sometimes it was in Father's bedroom. Initially he testified that Father had not touched his private parts when he was getting out of the shower, but he subsequently testified that one time when he had just gotten out of the shower and was naked, Father gave him his clothes, and when he put on his underwear, Father "grabbed it and then he moved it." Asked if Father was trying to dry him off, A. answered, " Oh, yeah. I think he was, or not. I don't remember." Earlier he had responded "no" when asked if Father had ever touched his privates when A. did not have any clothes on.

He stated that he told Mother about the touching "sometimes. Sometimes I kept it alone by – for me. It's my business." He denied that Mother told him that Father had touched his privates; he said he was the one who told her.

Asked whether Mother had ever told him anything about Father, he responded, "No. Well, yes. But my mom tells me not to tell you. Wait. No. I don't remember."[2] He also testified that one time he had seen Father touching G.'s butt in the children's room at Father's home.

---

**2**    One of the issues in the case was whether Mother had instilled fear in the boys regarding Father by telling them that he wanted to take them to Mexico and by telling them about his physical abuse of her.

G., who was five year old at the time of his testimony, was also able to distinguish between truth and lies. He testified that Father had touched his privates four times for "a little bit" when he was taking a shower. He denied that Father was helping him clean his privates and stated he cleans them by himself, and he denied that Father touched his privates while he was using the bathroom. He stated that Father touched his privates with one finger and demonstrated by touching his penis area with his index finger. When asked if Mother had ever told him that Father touched his privates, he answered, "Yeah – no." G. also said that A. had never told him that Father had touched A.'s privates, and he never saw Father touch A.'s penis. Asked how it made him feel when Father touched his privates, he answered, "Weird."

Mother testified in relevant part that on August 1, 2012, A. told her that his privates were hurting him, and she started asking him questions. His whole body posture changed and he put his head down and sunk down while she asked him the questions. She asked him if he was washing himself right, and he said yes. She asked if it hurt when he went to the bathroom, and he said no. She asked if he was playing with himself, and he said no. Then she asked him, "Is somebody touching you there?" He did not want to answer the question, and then he said yes. When she asked him who was touching him, he said Father wiggles and rubs and plays with his privates. Mother also testified that G. told his psychologist, the forensic psychologist, and the forensic examiner that Father had touched him.

Father's girlfriend, Bertha F., testified in relevant part that when A. and G. would sleep at her apartment, they shared a bedroom with Father, and she would sleep in another room with her children. She denied ever seeing inappropriate sexual behavior by Father and said the children had never mentioned anything.

9

*Dependency Court's Findings*

The dependency court found that the boys' testimony was "both credible and age appropriate and didn't show any signs of coaching," and the court rejected the argument of Father's counsel that the children's demeanors changed when they talked about the sexual abuse. The court found that "it was clear to me . . . from reading the reports, that A. was afraid of saying anything to anybody because he was going to get his dad in trouble, and he didn't want G. to get his dad in trouble. And when reassured that the Court wasn't here to put anybody in jail, both children seemed to be free to tell . . . what Father had done to them. They corrected counsel when counsel misstated something and were very clear in regards to what happened."

The court sustained the dependency allegations under subdivisions (a), (b), (d), and (j) of section 300. The court granted a permanent restraining order, protecting Mother and the boys, with an expiration date of October 29, 2015.

After asking if there was any further evidence as to disposition, and after Father's counsel indicated that he did not wish to be heard in regards to disposition, the court declared the boys dependents of the court and found that, under section 361, subdivision (c), there would be a substantial danger to the boys if they were returned to Father and no reasonable means to protect them without removing them from Father's custody. The court ordered the boys removed from Father and placed in Mother's home. No services were ordered for Father, and the court ordered that his visits with the boys be monitored.

Father has appealed from the court's adjudication and disposition orders.

**DISCUSSION**

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings, we determine if substantial evidence, contradicted or uncontradicted, supports them, drawing all reasonable inferences from the evidence to support the findings and orders of the dependency court. We do not reweigh the evidence, evaluate the credibility of witnesses, or exercise independent judgment, and we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that a reasonable trier of fact could find that the order sustaining jurisdiction is appropriate. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Jordan R.* (2012) 205 Cal.App.4th 111, 135-136 (*Jordan R.*).) Where, as here, a dependency petition alleges multiple grounds for jurisdiction, we may affirm the dependency court's finding of jurisdiction "'if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re Andy G.* (2010) 183 Cal.App.4th 1405, 1415, fn. 6.)

I.    *Jurisdiction Under Section 300 Based on Sexual Abuse*

Section 300, subdivision (d) provides, in relevant part, that a court may adjudge a child a dependent of the court if "[t]he child has been sexually abused . . . as defined in Section 11165.1 of the Penal Code, by his or her parent." Penal Code section 11165.1, subdivision (b)(4) describes sexual abuse as including "[t]he intentional touching of the genitals or intimate parts (including the breasts, genital area, groin, inner thighs, and buttocks) or the clothing covering them, of a child, . . . for purposes of sexual arousal or gratification, except that, it does not include

11

acts which may reasonably be construed to be normal caretaker responsibilities; interactions with, or demonstrations of affection for, the child; or acts performed for a valid medical purpose." Father contends that the boys' testimony about the alleged sexual molestation was "inconsistent, confused and indicative of having been coached." Father further contends that jurisdiction was not properly found because there was insufficient evidence that Father touched the boys' genitals or buttocks for the purpose of sexual arousal or gratification. We reject his contentions.

A. *Credibility of Boys' Statements*

Father contends that the boys' out-of-court statements and their testimony at the adjudication hearing regarding the sexual abuse were inconsistent and indicative of coaching. However, the dependency court found that both boys' testimony was credible and did not show any signs of coaching. "To the extent the trial court's findings rest on an evaluation of credibility, the findings should be regarded as *conclusive* on appeal. [Citation.] To warrant rejection of the statements of a witness who has been believed by the trier of fact, it must be physically impossible for the statements to be true, or their falsity must be apparent without resorting to inferences or deductions." (*Jordan R., supra*, 205 Cal.App.4th at p. 136 [deferring to juvenile court's findings that minor was credible when she testified regarding sexual abuse].) The instant case does not present any circumstances that would warrant our rejection of the boys' statements that the dependency court credited as true. We defer to the dependency court's findings that the boys' statements and testimony regarding sexual abuse by Father were credible and consistent.

12

B. *Sufficiency of Evidence of Sexual Intent*

Father also contends there was insufficient evidence presented that he intentionally touched the boys' private parts for the purpose of sexual arousal or gratification. "To determine whether a defendant acted with sexual intent, all the circumstances are examined. Relevant factors include the nature and manner of the touching, the defendant's extrajudicial statements, the relationship of the parties and 'any coercion, bribery or deceit used to obtain the victim's cooperation or avoid detection.'" (*In re. R.C.* (2011) 196 Cal.App.4th 741, 750, quoting *People v. Martinez* (1995) 11 Cal.4th 434, 445.)

Sufficient evidence was introduced at the adjudication hearing that Father intentionally touched the boys for the purpose of sexual arousal or gratification. A. testified that Father grabbed his privates on purpose, and that it did not happen accidentally while they were playing. He testified that Father had not helped him clean his private areas since he was very young, and Father himself told DCFS that he never touched A.'s private areas for any reason, including cleaning or bathing A. Thus, there was no evidence from which to infer that Father touched A.'s private areas for an innocent purpose such as helping him bathe. Further, A. testified that Father "wiggled" and "moved" his penis, which also suggests a sexual intent. In addition, A.'s testimony that he had to ask Father to stop touching him, and the fact that A. testified to numerous instances in which Father grabbed his privates in the living room and Father's bedroom, makes it unlikely that the contact was for an innocent purpose.

Similarly, G. testified that Father had touched his privates four times when he was taking a shower, and he denied that Father was helping him clean his privates or helping him use the bathroom. Further, the manner in which he testified that Father touched his penis – touching it with his index finger – is not

13

indicative of an innocent purpose. It is also significant that G. testified that it made him feel "weird" when Father touched his privates. The testimony of A. and G., which the dependency court found credible, provided a sufficient basis for concluding that Father had a sexual intent in touching his sons' private areas.

## II. *Removal of Boys from Father's Custody*

Father also asserts that insufficient evidence supported the dependency court's disposition order finding that there would be a substantial danger to the boys' physical health and emotional well-being if they were returned to Father's custody, and ordering that Father's visits with the boys be monitored. Under section 361, subdivision (c), "[a] dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."

"The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.)

County Counsel argues that Father forfeited the issue of the removal of the boys from his custody, and the issue of monitored visitation, by failing to argue below for a different disposition. We agree. Father did not request any particular

14

disposition below, and when the court asked whether Father wished to be heard as to disposition, Father's counsel specifically indicated that he did not. Therefore, he has forfeited the right to challenge the disposition order on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 [principle that "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court" applies in dependency proceedings]; *In re A.A.* (2012) 203 Cal.App.4th 597, 606 [by failing to request custody, mother forfeited the right to be considered for placement].)

Moreover, even if Father had not forfeited the issue, given the evidence that Father sexually abused the boys, the court did not abuse its discretion in removing them from Father's physical custody and ordering monitored visitation.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.
SUZUKAWA, J.