Filed 1/15/14  In re J.S. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH & HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.S., et al.,<br><br>    Defendants and Appellants. | A137671<br><br>(Marin County<br>Super. Ct. No. JV25193A) |

J.S. (Father) and A.R. (Mother) appeal an order of the juvenile court continuing its supervision of their daughter, J.S. (Minor) and requiring Father to submit to a polygraph test as part of his service plan.  We shall affirm the order.

## I.  BACKGROUND

We are familiar with the background of this case through our review of an earlier appeal in this matter, which challenged jurisdictional and dispositional orders of the juvenile court with respect to Minor.  (*In re K.S.* (Mar. 26, 2012, A131951) [nonpub. opn.].)[1]

---

[1] We take judicial notice of the record on appeal in *In re K.S.*, A131951.

1

As we explained in *In re K.S.*, Marin County Health and Human Services (the Department) filed petitions in October 2010 pursuant to Welfare and Institutions Code[2] section 300 on behalf of two half-sisters, then 12-year-old K.S. and then two-year-old Minor. Mother is the mother of both K.S. and Minor. Father is K.S.'s stepfather (and paternal uncle) and Minor's father. Evidence from the jurisdiction report and the jurisdictional hearing indicated K.S. had told a social worker that Father had been touching her inappropriately for three years. He had touched her on her knees and thighs, and had tried to touch her on her breast and between her legs. K.S. reported Father had touched her on her " ' private part,' " and had " 'put his penis in [her] private.' " K.S. also reported that Father would look through the curtain in her room when she was changing her clothes.[3] At the jurisdictional hearing, K.S. testified that Father had intercourse with her on more than one occasion. On one of these occasions, as she told him to stop, Father said, " 'Oh no, you're gonna see how good it feels having it, having sex.' " Minor was sleeping in the bedroom on a couple of occasions when Father molested her. Mother would call K.S. " 'a slut, a whore, a prostitute' " because she went out with boys, and K.S. testified that Mother hit her regularly and yelled at her without provocation. Mother and Father would hit Minor.

There was conflicting evidence about whether K.S. told Mother that Father had sexually abused her. Mother told a social worker she thought K.S. was lying in order to separate Mother and Father or because Father had restricted her television and radio use. Mother later expressed uncertainty about whether the abuse had taken place. Father denied having sexually abused K.S. However, Mother had sought and obtained temporary orders restraining Father from having contact with the children except court-ordered visitation and reported that he had moved out of the family home.

---

[2] All undesignated statutory references are to the Welfare and Institutions Code.

[3] At the time, Mother, Father, K.S. and Minor shared a bedroom, which contained a bunk bed and a separate bed, with a curtain between the beds. Mother had told a police officer she slept in the separate bed, K.S. slept on the top bunk, and Father and Minor slept on the bottom bunk.

The juvenile court found K.S.'s testimony " 'compelling, credible, and trustworthy,' " found that Mother not only had failed to protect K.S. but would also fail to protect Minor, and found it had jurisdiction over both children.

After a dispositional hearing, the juvenile court continued Minor in foster care. Both Mother and Father received reunification services for Minor.

Mother and Father appealed the jurisdictional and dispositional orders, and in *In re K.S.*, we affirmed the orders, concluding they were supported by substantial evidence. In doing so, we concluded that the evidence supported a conclusion that Father's actions in sexually abusing K.S. placed Minor at risk of harm. (*In re K.S.*, *supra*, at p. 18.)

In August 2011, the juvenile court granted the Department discretion to place Minor in Mother's care, and Minor returned to Mother at the end of that month. K.S. remained in foster care.

A report prepared for a September 2011 six-month status review hearing indicated that Father had participated in sex offender therapy because it had been mandated by the court in order for him to reunify with Minor, but that he continued to maintain that he had not engaged in any sexually inappropriate behavior with K.S. Father said he had treated group therapy as an opportunity to learn about the mistakes of others, but he did not believe it was necessary for his own rehabilitation or for the healing of his family. Father's therapist reported that Father had been consistent in denying that he had done anything inappropriate; the therapist believed there was a "50/50 chance" that Father had behaved inappropriately toward K.S. Father had expressed interest in taking a lie detector test, something the therapist said most clients would be afraid to take. The juvenile court continued its jurisdiction over Minor and ordered continued family maintenance services.

The Department prepared a status report for a March 2012 family maintenance review hearing. (§ 364.) The report indicated that Minor was still living in Mother's care, and that Mother's parenting skills had improved. Father had attended his sex offender group therapy regularly, and continued to deny having behaved inappropriately toward K.S. or Minor. The group therapist stated that Father had been cooperative in

3

therapy and had participated in the group, and recommended that Father return home and continue to receive family maintenance services. Mother believed the family therapy she had been attending had improved her skills as a parent, did not believe the dependency case should continue, and believed she could "be protective" if Father returned to the home and that Minor would be safe with him. The juvenile court continued its supervision of Minor, ordered continued family maintenance services, and allowed Father to return to the home.[4]

In preparation for a status review hearing, the Department filed a report in September 2012, noting that Minor was living with Mother and Father. Mother reported that Minor and Father had a positive relationship, Minor had told a social worker she liked playing with Father, and the social worker said their games appeared to be appropriate. Father, Mother, and Minor had attended family therapy, and Mother was attending individual therapy. Mother's therapist reported that Mother said she provided constant supervision of Minor, and the therapist believed Mother would seek help if she saw anything of concern. Father had been allowed to leave his group sex offender therapy at the end of April 2012. He had not acknowledged behaving inappropriately toward K.S. Father had begun individual sex offender therapy in May 2012, but had found it difficult to attend consistently because of health problems, and had participated since about August 2012.

Father's individual therapist was concerned that Father seemed to have no empathy for K.S., and said that empathy was a "barrier to abuse." She told the social worker that Father had "not met any of the goals of therapy including understanding the cycle of abuse, understanding patterns and impulses that cannot be controlled, acquiring skills to work with triggers, developing empathy for the victim, and repairing the relationship." She said that "if [Father] did not receive the treatment that he needed, and was actually a sex offender, he would offend again." The therapist recommended that

---

[4] The court also ordered a permanency planning hearing for K.S. pursuant to section 366.26. In doing so, it noted that it continued to believe K.S.'s version of events over that of Father.

Father submit to a polygraph test for therapeutic purposes; such a test could be used as "a way to confront clients about their denial, encourage them to be honest, and to be accountable for their actions," and recommended that Father continue his treatment to prevent possible recidivism. The therapist recommended that Father not see Minor changing clothes, and that he not provide sexual education to Minor. Mother agreed to abide by these recommendations.

The Court Appointed Special Advocate (CASA) recommended that the case be dismissed. Among other things, the CASA stated that Mother appeared to have applied many of the positive parenting techniques she had learned, and that the bond between Father and Minor appeared strong.

The Department filed an addendum report in December 2012. According to this report, Minor told a social worker at the end of September that she slept with Father. Minor asked the social worker not to tell her former foster parent because the former foster parent would take her away from her home if she knew. Minor also told the social worker she would change clothes in front of Father, and asked the worker not to tell the former foster parent. Minor said that neither Father nor anyone else had touched her inappropriately. The social worker spoke with Mother, who said Minor wanted Father by her side, and that Father stayed with Minor in bed until Minor fell asleep. Mother and Father would then switch places, so that Mother slept with Minor and Father slept alone. Mother denied that Minor changed clothes in front of Father. Mother agreed to comply when the social worker told her Father could not sleep with Minor.

The addendum report also explained that, in October 2012, Minor told the social worker "that she no longer sleeps with her father however then she stated that she 'sometimes' sleeps with her father." When this happened, according to Minor, Father was clothed and Minor was wearing a nightgown or pajamas, and Father touched only her arms. Minor did not report any inappropriate play. Mother said Minor had not been sleeping with Father. The social worker asked Father about sleeping in the same bed with Minor, and Father said he "felt this ha[d] been made into a big issue when it was just a small thing." He believed it was natural for a father to sleep with his young children,

5

and that it was " 'crazy' " to think he would harm his daughter. He also said Minor was having trouble adjusting to the new routine of not sleeping with Father, but that he and Mother had been firm about enforcing this rule.

Finally, the addendum report explained that Father stated that he would be willing to take the polygraph as long as he did not have to pay for it.[5] At a contested review hearing, the social worker testified that Father's sex offender therapist was concerned that Father had made so little progress and that a polygraph would allow him to be more honest and make more progress within his therapy. She also said that if the polygraph test indicated there had been no sexual abuse, there would be no reason to keep the dependency case open. If the test indicated sexual abuse had occurred, the information would be used only in a therapeutic setting, and the social worker would recommend that the Department provide six months more of services and that Father continue to participate in individual sex offender therapy. The Department would have the results of the polygraph test, and the social worker did not know whether the results would be included in any report to the court.

The juvenile court continued its jurisdiction over Minor, finding that conditions that would justify the initial assumption of jurisdiction under section 300 still existed or were likely to exist if supervision were withdrawn. The court continued family maintenance services pursuant to an updated case plan, which included the requirement that Father submit to a polygraph test.

## II. DISCUSSION

### A. Continued Jurisdiction

Appellants contend there is no substantial evidence to support the juvenile court's finding that Minor was at continued risk of harm in the absence of court supervision. "In reviewing the sufficiency of the evidence on appeal, we look to the entire record for substantial evidence to support the findings of the juvenile court. [Citations.] Evidence

---

[5] Father's prior willingness to accept a polygraph test when he was talking with social workers is at odds with his comment in his reply brief that "[f]or [Father], the test is offensive and reprehensible."

sufficient to support the court's finding must be reasonable in nature, credible, and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case." (*In re N.S.* (2002) 97 Cal.App.4th 167, 172.) We consider the evidence in a manner favorable to the prevailing party, resolve all conflicts in favor of the juvenile court's order, and uphold the trial court's order unless no rational fact finder could have reached the same conclusion. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401; *In re Athena P.* (2002) 103 Cal.App.4th 617, 629.)

Applying these standards, we conclude substantial evidence supports the juvenile court's finding. In the previous appeal in this dependency, *In re K.S.*, we reviewed the evidence that Father molested Minor's sister and that Mother did not assist her daughter, and concluded it provided substantial evidence to support the juvenile court's assumption of jurisdiction over Minor. (*In re K.S.*, *supra*, A131951, [at p. 18].) We recognize that since that time, Father has participated in group sex offender therapy and that there have been no allegations that he sexually abused Minor. However, there was evidence that Father's therapist believed he had not met any of the goals of therapy, including understanding the cycle of abuse, working with triggers, and developing empathy for the victim. There was also evidence that even after extensive therapy, Father lay in bed with Minor as she fell asleep, was present while she was changing her clothes, and was aware that those activities might cause concern in the dependency proceedings, and that Mother did not prevent him from doing so. From these facts, the juvenile court could reasonably conclude continued therapy and supervision were necessary to protect Minor.

Appellants also argue that Father's refusal to admit abusing K.S., standing alone, is insufficient to continue jurisdiction, and that it would be "Kafkaesque" to require him to admit to sexual abuse he contends never happened in order to end juvenile court jurisdiction over his daughter. (See *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1752–1753 [recognizing risk that innocent parent might feel compelled to admit to sexual abuse in order to receive reunification services].) Our conclusion, however, is based on the record as a whole, which provides evidence that Father did indeed sexually

7

abuse K.S. and that the progress he and Mother have made is insufficient to protect Minor in the absence of continued juvenile court supervision.

We are not persuaded otherwise by appellants' reliance on *In re N.S.*, *supra*, 97 Cal.App.4th 167, 169–170, in which the Court of Appeal concluded the evidence did not support the continuation of juvenile court jurisdiction. The jurisdiction there was originally based on the father's inability to manage his stress and anger. (*Id*. at pp. 172–173.) In the ensuing six months, however, there was no evidence the father had acted impulsively or had a temper outburst, and the evidence showed he had complied completely with his case plan and made good progress in therapy, and his therapist could identify no factors that left the minor at risk in the father's care. (*Id*. at p. 173.) Here, as we have explained, Father's therapist had expressed concern about his lack of progress in therapy; moreover, in the context of this case, the evidence that Father got into bed with Minor at bedtime and was present as she changed clothes could reasonably raise concerns for Minor's safety.

## B. Polygraph Test

Appellants contend the juvenile court erred in requiring Father to submit to a polygraph test as part of his case plan.

A juvenile court has broad discretion to determine what would best serve a child's interest and fashion a dispositional order, which may include therapy for a parent. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006; *In re Lamonica H.* (1990) 220 Cal.App.3d 634, 649–650; *In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652; § 362, subd. (a).) Appellants have not shown an abuse of that discretion here. It is clear that Father's therapist recommended, and the juvenile court ordered, a polygraph test in order to further the purposes of Father's therapy; that is, in order to assist him in being honest in therapy and in taking responsibility for the actions that led in part to the dependency. The therapist had opined that if Father was actually a sex offender and did not receive the treatment he needed, he would offend again. The juvenile court could reasonably conclude the polygraph test would assist Father in benefitting from that treatment and thereby reduce the risk of harm to Minor.

8

We note that in a different context, the court in *Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 320–321, considered the propriety of requiring, as a condition of probation, that a probationer submit to polygraph testing as part of his therapy. In response to the probationer's challenge, the court concluded that "periodic polygraph examinations in furtherance of [the probationer's] stalking therapy program is a valid condition of probation because it is reasonably related to the crime of which [he] was convicted and to possible future criminality."[6] (*Id.* at p. 321, italics omitted.) Similarly here, we see no abuse of the lower court's discretion in ordering a polygraph test as part of Father's sex offender therapy.

Appellants argue, however, that under Evidence Code section 351.1, subd. (a), the results of a polygraph examination are inadmissible in court, that future recommendations of the therapist and social worker will be based on those inadmissible results, and that therefore they will impermissibly influence the court in making future decisions regarding Father's parental rights.[7] This argument fails. First, Evidence Code section 351.1 provides that the results of a polygraph examination are not admissible "in any *criminal* proceeding . . . or in any trial or hearing of a juvenile for a *criminal* offense, . . . unless all parties stipulate to the admission of such results." (Italics added.) This

_____

[6] The court concluded, however, that the condition was overbroad because it did not limit the questions to those relating to the successful completion of the stalking therapy program and the crime of which the defendant was convicted. (*Brown v. Superior Court*, *supra*, 101 Cal.App.4th at p. 321.) Here, the juvenile court ordered services "as modified in the updated case plan." That case plan provides, "Per the recommendation of [Father's] sex offender therapist, [Father] will participate in weekly individual therapy and submit to a polygraph test." It appears to us sufficiently clear that the polygraph test may relate only to those matters pertinent to Father's sex offender therapy.

[7] Appellants do not contend Father's Fifth Amendment rights are implicated by the requirement of a polygraph test, and we see no cause for such concern. It does not appear that Father has been prosecuted for sexually abusing K.S. In any case, it is well established that a person subject to prosecution in the criminal courts is entitled to use immunity for statements made during court-ordered therapy in a dependency case. (*In re Lamonica H.*, *supra*, 220 Cal.App.3d at p. 649; *In re Jessica B.* (1989) 207 Cal.App.3d 504, 521.)

statute does not prohibit use of polygraph tests in dependency proceedings.  (See *In re Kathleen W.* (1987) 190 Cal.App.3d 68, 72.)  Rather, subject to a foundational hearing, the results of a polygraph test may be admissible if the results are relevant to the primary issue before the court.  (*Id*. at p. 73; *In re Jordan R.* (2012) 205 Cal.App.4th 111, 122.)  In any case, based on this record, it would be speculation to conclude the trial court will make orders based on the results of a polygraph test, whether or not admissible.  In fact, the juvenile court indicated that if the results of a polygraph test were in a social worker's report, the court would disregard that information.  Accordingly, we reject appellants' argument.

## III.  DISPOSITION

The order appealed from is affirmed.

_____
Rivera, J.

We concur:


_____
Reardon, Acting P.J.


_____
Humes, J.

11