Filed 8/24/16  In re M.B. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re M.B., et al., Persons Coming Under the Juvenile Court Law. | B267380 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER B.,<br><br>        Defendant and Appellant. | (Los Angeles County Super Ct. No. CK84372) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Veronica McBeth, Judge.  Conditionally affirmed and remanded with directions.

Roni Keller, under appointment by the Court of Appeal for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, and Tracey F. Dodds, Deputy County Counsel, for Plaintiff and Respondent.

_____

Christopher B. (Father) appeals from the juvenile court's jurisdiction findings and disposition order declaring his children, M.B. and N.B., dependents of the court pursuant to Welfare and Institutions Code[1] section 300 and removing them from Father's custody. On appeal, Father contends that the juvenile court erred in excluding evidence pertaining to sexual abuse findings made against Father in a prior dependency case. Father also claims that the juvenile court failed to comply with the notice requirements of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.). We remand the matter to allow the juvenile court to comply with ICWA and otherwise conditionally affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Juvenile Dependency History

Father and Eva H. (Mother) are the parents of four children—T.B. (a boy born September 2008), Y.B. (a girl born June 2010), M.B. (a boy born November 2011), and N.B. (a boy born January 2013). Father also three children—F.B. (a girl born May 1993), A.B. (a boy born March 1996), and Joe B. (a boy born July 2012)—from other relationships. Only M.B. and N.B., Father's two youngest children with Mother, are the subject of the current dependency petition.[2]

In 1999, the juvenile court sustained a dependency petition filed on behalf of F.B. and A.B. Father's two children with his former girlfriend, Tracey P. The court found that, starting in December 1995, Father had sexually abused his stepdaughter, D.P. (born December 1985), on a weekly basis by forcefully penetrating the child's vagina with his penis, digitally penetrating the child's vagina with his fingers, forcing the child to sit on his penis, and watching the child while she was naked. The court further found that Father had sexually abused his daughter, F.B., by fondling the child's vagina. F.B. and

---

[1] Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

[2] Mother is not a party to this appeal.

A.B. received permanent placement services, and Father's parental rights over both children were terminated in December 2002.

In 2010, the juvenile court sustained a dependency petition filed on behalf of T.B. and Y.B., Father's two eldest children with Mother. The court found that Father's prior sexual abuse of his stepdaughter, D.P., endangered the health and safety of T.B. and Y.B. and placed them at risk of serious physical harm and sexual abuse. The children were placed in the home of Mother on the condition that Father not reside in the home. The court also ordered Mother and Father to complete various programs, including individual counseling, sexual abuse counseling, and parenting education.

In 2012, the juvenile court sustained a dependency petition filed on behalf of Joe B., who has a different mother than Father's other children. Father was denied family reunification services in that dependency case, and his parental rights over Joe were terminated in November 2013.

## II. The Current Dependency Petition

On July 28, 2015, the Department of Children and Family Services (DCFS) filed the current dependency petition on behalf of M.B. and N.B. pursuant to section 300, subdivisions (a), (b), (d), and (j). The petition alleged that M.B. and N.B. were at risk of serious physical harm because Father and Mother had physically abused the children's older sibling, Y.B., by striking her on the buttocks with a belt. The petition further alleged that M.B. and N.B. were at risk of serious physical harm and sexual abuse based on Father's prior sexual abuse of his stepdaughter, D.P., and Mother's unwillingness to protect the children from the risk of sexual abuse posed by Father.

In its detention report, the DCFS expressed concern that Father continued to deny the sexual abuse allegations in the prior sustained petition. In addition, Mother did not believe that Father had committed any prior sexual abuse, and she was planning to marry Father as soon as the dependency case for T.B. and Y.B. was closed. Y.B. also informed the DCFS that Father lived in the family's home with Mother and the children, but slept at night in a recreational vehicle parked outside the home.

3

Prior to filing the petition, the DCFS spoke with Dr. John Lewis, the therapist who had been providing counseling services to the family. Both Mother and Father had been attending family counseling with the children, and they had continued to participate in these services after completing their 20 court-ordered sessions. As of June 2015, Mother had completed 27 family counseling sessions and Father had completed 26 sessions. According to Dr. Lewis, the family was cooperative and communicated well during their counseling sessions. The children appeared to be happy with no signs of physical abuse, and they got along well with one another and their parents. Dr. Lewis never saw any inappropriate physical interaction between Father and the children.

Father also had been participating in a sexual abuse counseling program, and as of June 2015, he had completed 22 of his 32 court-ordered sessions. Dr. Lewis reported that Father had gained insight into the characteristics of child sexual predators and had taken a leadership role within the group because he was older than many of the other participants. Although Father had missed some of the sessions, he was actively engaged in the group and was able to express his thoughts and feelings openly. Dr. Lewis acknowledged, however, that Father continued to deny that he had sexually abused his stepdaughter or any other child. Mother also denied that any sexual abuse had occurred.

At the July 28, 2015 detention hearing, the juvenile court found that there was prima facie evidence that M.B. and N.B. were persons described by section 300. The court ordered that the children be detained from Father, but remain released to Mother pending an adjudication hearing. In his Parental Notification of Indian Status form for the current dependency case, Father indicated that he may have Blackfoot ancestry and that his paternal great-aunt would have more information on the matter. In addressing whether ICWA notice was required based on Father's disclosure, the juvenile court stated: "I do see it in the report back in 2010. The court found that there was no reason to find that there was Native American heritage. So there's no ICWA pursuant to the prior finding . . . notwithstanding the comment here."

4

## III.    Jurisdiction and Disposition Hearing

For its August 24, 2015 jurisdiction/disposition report, the DCFS conducted interviews with Mother and the two older children, T.B. and Y.B., about the allegations in the current dependency petition. The agency also attempted to interview Father about the petition, but he did not make himself available for an interview. With respect to the allegations of physical abuse, Mother and the children denied that the parents ever hit the children or engaged in any inappropriate discipline. Mother noted that Father only had monitored visitation with the children and was never alone with them. With respect to the allegations based on Father's prior sexual abuse of D.P., Mother reported that she was not in a relationship with Father at that time and could not say whether any abuse had occurred. She believed, however, that a judge had found that there was no evidence to charge Father with any crime. Mother also stated that girls often lie, and she questioned why the DCFS continued to bring up the sexual abuse allegations. In their interviews, T.B. and Y.B. indicated that they were unfamiliar with the prior allegations, and denied that anyone had ever touched them in a sexually inappropriate manner.

In its report, the DCFS noted that both Mother and Father had developmental disabilities and had received regional center services in the past. A counselor from an affiliated agency had been working with Mother and the children for the past year and visited their home three times per week. The counselor stated that the children were doing well and she had no concerns about their safety. She also reported that she had never seen Father during her visits to the family's home, and she believed that he stayed in a recreational vehicle in front of the home. The counselor had served as the monitor for one of Father's visits with the children in July 2015. According to the counselor, the children appeared to be very attached to Father during the visit, and she did not observe any inappropriate behavior between them.

In its report, the DCFS stated that Mother had completed all of her court-ordered programs in the dependency case for T.B. and Y.B., including parenting education, individual counseling, and sexual abuse awareness counseling. Mother and Father also had completed a family counseling program, and Father was in the process of completing

a sexual abuse counseling program for perpetrators. The agency remained concerned, however, about M.B. and N.B. because both Father and Mother continued to deny the sexual abuse allegations that were found to be true in the prior sustained petition. The DCFS recommended that M.B. and N.B. be declared dependents of the juvenile court and remain placed in the home of Mother. The agency further recommended that the juvenile court order family maintenance services for Mother, including parenting education and individual counseling, but deny family reunification services for Father.

On August 26, 2015, the juvenile court held the jurisdiction hearing on the section 300 petition filed on behalf of M.B. and N.B. The court admitted into evidence the reports filed by the DCFS in the current dependency case, and took judicial notice of the prior sustained petitions and court-ordered case plans in the cases involving the children's siblings. At Father's request, the court also admitted into evidence an August 22, 2015 a letter from Dr. Lewis regarding Father's progress in his sexual abuse counseling program. According to the letter, Father had completed 33 sessions with a focus on sexual offender behaviors in the home and the community. His therapy also covered case-related issues. Dr. Lewis stated that Father continued to benefit from his therapy, that he shared his thoughts and feelings well, and that he was cooperative during his sessions. Prior to adjudicating the petition, the juvenile court decided that it wanted to hear directly from Dr. Lewis about the extent of Father's rehabilitation efforts.

On September 14, 2015, the jurisdiction hearing resumed, and Dr. Lewis was called as a witness. Dr. Lewis testified that he was a licensed clinical social worker and had specialized training in the treatment of sexual predators and offenders. He currently was treating Father in weekly family counseling sessions with Mother and their two older children, T.B. and Y.B. He also was treating Father in weekly group therapy sessions for sexual offenders. Dr. Lewis had a general understanding that Father had been accused of sexually molesting his stepdaughter several years ago, but he was not aware that Father also had been accused of molesting his biological daughter. Although Dr. Lewis had been treating Father for the past four years as part of Father's court-ordered services, he had never been given copies of the prior sustained petitions or the reports filed by the

6

DCFS. Dr. Lewis testified that, during his group therapy sessions, Father consistently denied that he had ever sexually abused a child and expressed concern that he was being coerced to attend counseling for sexual offenders.

When asked if a sexual offender could be rehabilitated if he or she refused to admit the sexual abuse, Dr. Lewis answered: "If they committed a crime, I think they need to admit it and have remorse for the victim to begin their rehabilitation process." Dr. Lewis also stated that he did not believe a sexual offender could be completely rehabilitated if he or she did not show any remorse toward the victim. While Father had shown empathy for other sexual offenders and victims of sexual abuse during his group sessions, he never expressed remorse for his own victims because he continued to deny that he had sexually abused them. When asked if Father posed a risk of harm to M.B. and N.B., Dr. Lewis responded: "I can't make a blanket statement about somebody being at risk. I know that he has not shown any risk during treatment. He's shown concern for his children, all of them, including the two children you're referring to. He's acted appropriately in terms of his parenting style and skills when he's been in treatment, and that's the extent that I can comment about his risk level."

Following Dr. Lewis's testimony, Father sought to call F.B. as a witness. When asked for an offer of proof, Father's counsel stated that F.B. would testify as to Father's risk to M.B. and N.B., and the basis of her testimony would be that she currently had a relationship with Father and there was no animosity between them. After the DCFS objected on relevance grounds given the sexual abuse findings in the prior sustained petition, Father's counsel stated that F.B. would testify that Father never sexually abused her. The juvenile court then ruled that it would not allow the testimony.

At the conclusion of the jurisdiction hearing for M.B. and N.B., the juvenile court sustained an amended petition under section 300, subdivisions (b), (d), and (j). The court dismissed the counts alleging that Father and Mother had physically abused the children's sibling, Y.B., by inappropriately disciplining her. The court sustained the counts alleging that Father's prior sexual abuse of his stepdaughter, D.P., and Mother's unwillingness to protect the children from the risk of sexual abuse by Father, placed M.B. and N.B. at risk

7

of serious physical harm and sexual abuse. The court noted that Father previously was found to have sexually abused his stepdaughter and daughter, and that both Father and Mother continued to deny that any sexual abuse had occurred. At Father's request, the matter was set for a contested disposition hearing.

On October 5, 2015, the juvenile court held the disposition hearing for M.B. and N.B. The court declared the children dependents of the court pursuant to section 300 and ordered that they be removed from Father's care and custody and remain placed in the home of Mother. The court granted Father family reunification services and ordered him to participate in sexual abuse counseling for perpetrators. The court also ordered the DCFS to ensure that Father's therapist received copies of the prior sustained petitions and reports. On October 9, 2015, Father filed a timely notice of appeal from the juvenile court's jurisdiction findings and disposition order.

**DISCUSSION**

## I. Denial of Father's Request To Call F.B. as a Witness

On appeal, Father argues that the juvenile court abused its discretion and violated his due process rights by denying his request to call F.B. as a witness at the jurisdiction hearing. Father also asserts that the alleged error in excluding F.B.'s testimony requires reversal of the jurisdiction and disposition orders. This claim lacks merit.

In juvenile dependency cases, "[t]he trial court is vested with broad discretion in ruling on the admissibility of evidence. [Citations.] "'[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion.'" [Citation.] ""The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason."'" [Citation.]" (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 121.) Even where the trial court abuses its discretion in ruling on the admissibility of evidence, "'[a] judgment shall not be reversed by reason of erroneous exclusion of evidence unless a miscarriage of justice is shown … .' [Citation.]" (*In re N.V.* (2010) 189 Cal.App.4th 25, 31.) In a dependency case, a miscarriage of justice is shown "only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but

for the error." (*In re Celine R.* (2003) 31 Cal.4th 45, 60.) "'While a parent in a juvenile dependency proceeding has a due process right to a meaningful hearing with the opportunity to present evidence [citation], . . . [the] right to present evidence is limited to relevant evidence of significant probative value to the issue before the court.' [Citation.]" (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 733.)

In this case, the trial court did not abuse its discretion or violate Father's due process rights in denying his request to call his daughter, F.B., as a witness at the jurisdiction hearing. Father's counsel initially stated at the hearing that F.B. would testify as to Father's risk to M.B. and N.B. The basis of F.B.'s opinion that Father did not pose a risk of harm to the children was that there was no animosity between F.B. and Father in their current relationship. When the juvenile court noted that it did not appear that Father was seeking to call F.B. to refute the sexual abuse findings in the prior sustained petition, Father's counsel clarified that F.B. would testify that Father never sexually abused her. However, the issue before the juvenile court at the 2015 jurisdiction hearing for M.B. and N.B. was not whether Father had sexually abused F.B. when she was a child. That issue was decided long ago in the 1999 dependency case filed on behalf of F.B., her brother, A.B., and her stepsister, D.P. The issue before the juvenile court in the current dependency case was whether Father's prior sexual abuse of F.B. and D.P., and the continual denial of such abuse by both Father and Mother, placed their two youngest children, M.B. and N.B., at risk of physical harm and sexual abuse. In determining whether Father posed a current risk of harm to M.B. and N.B., the juvenile court was not required to permit Father to re-litigate the findings made in the prior dependency case.

Furthermore, to the extent that F.B.'s proffered testimony had any relevance to the issues raised in the current dependency petition, the juvenile court reasonably could find that the probative value of such evidence was minimal and was substantially outweighed by the risk that its admission would necessitate undue consumption of time. The 1999 petition was sustained based on findings that Father had sexually abused both F.B., his biological daughter, and D.P., his stepdaughter. The findings concerning F.B. were that Father had fondled the child's vagina. While the sexual molestation of F.B. was clearly

reprehensible, the most serious findings in the 1999 case concerned Father's conduct toward D.P. Father's sexual abuse of D.P. was prolonged and severe in nature. The abuse included acts of forcible rape and digital penetration of the child's vagina and occurred on a weekly basis over a two-year period. Under these circumstances, even if F.B. had been allowed to testify at the jurisdiction hearing that Father did not sexually molest her, she could not have refuted the prior sustained allegations that Father had committed multiple serious acts of sexual abuse against D.P.

For these reasons, even if we were to conclude that the juvenile court abused its discretion in excluding F.B.'s testimony at the jurisdiction hearing for M.B. and N.B., any such error would have been harmless. Given the prior findings concerning Father's sexual abuse of D.P. as well as the nature and extent of such abuse, there is no reasonable probability that Father would have obtained a more favorable result at the jurisdiction hearing had F.B. been allowed to testify that Father never sexually abused her. On this record, Father has failed to demonstrate prejudicial error in the juvenile court's ruling.

## II.    Non-Compliance with the ICWA Notice Requirements

Father contends, and the DCFS concedes, that the juvenile court failed to comply with the inquiry and notice requirements of ICWA. Although Father had indicated in his 2015 Parental Notification of Indian Status form that he may have Blackfoot ancestry, the juvenile court summarily concluded at the detention hearing that ICWA did not apply based on a prior finding in the 2010 dependency proceedings. However, "a juvenile court has an affirmative and continuing duty in all dependency proceedings to inquire into a child's Indian status. (§ 224.3(a).) If a court determines it has reason to know a child is an Indian child, the court must notify the [Bureau of Indian Affairs] and any relevant tribe so that the tribe may determine the child's status and decide whether to intervene. (§ 224.2.)" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 14; see also *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1386 ["[j]uvenile courts and child protective agencies have "'an affirmative and continuing duty'" to inquire whether a dependent child is or may be an Indian child"].) The court has reason to know that a child is an Indian child if, among

other circumstances, "a person having an interest in the child . . . informs or otherwise provides information suggesting that the child is an Indian child to the court." (Cal. Rules of Court, rule 5.481(a)(5)(A).)

Because the juvenile court failed to comply with the requirements of ICWA, the jurisdiction findings and disposition order may only be conditionally affirmed. A limited remand is required. Upon remand, the juvenile court shall direct the DCFS to make further inquiries regarding the possible Indian status of M.B. and N.B. (§§ 224.1, 224.3), and if appropriate, send an ICWA notice to any relevant tribes in accordance with ICWA and California law (§ 224.2, subd. (a)). The DCFS shall thereafter notify the court of its actions and file certified mail, return receipts for any ICWA notices that were sent together with any responses received. The court shall then determine whether the ICWA inquiry and notice requirements have been satisfied and whether M.B. and N.B. are Indian children. If the court finds that M.B. and N.B. are Indian children, it shall conduct a new disposition hearing, as well as all further proceedings, in compliance with ICWA and related California law. (*In re Kadence P.*, *supra*, 241 Cal.App.4th at pp. 1388-1389.)

## DISPOSITION

The matter is remanded for compliance with ICWA and related California law as set forth above. In all other respects, the juvenile court's jurisdiction findings and disposition order are affirmed.


ZELON, J.


We concur:


PERLUSS, P. J.


SEGAL, J.

11