Filed 9/28/16  In re E.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.S., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JESUS S.,<br><br>Defendant and Appellant. | F072847<br><br>(Super. Ct. No. 517344)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Jennifer A. Gibson, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Jesus S., father, contests the jurisdictional findings that he placed his daughter, E.S., at risk of harm and removing her from his custody.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and Ariel A. are the parents of E.S., born in October 2010. Ariel also has a child with Mark W., O.W., born in November 2013. Ariel and Mark lived together with both children.[1]

At E.S.'s birth, Ariel tested positive for THC. When O.W. was born, both Ariel and O.W. tested positive for amphetamines and THC. Ariel accepted family maintenance services through the Stanislaus County Community Services Agency (agency) to address her substance abuse, inappropriate parenting, and mental health issues. Although Ariel did not complete her substance abuse program, family maintenance services were dismissed and the case closed in November 2014 when Ariel continued to test negative for substances.

In May of 2015, approximately six months after Ariel's case was closed, the agency received a referral that E.S. and O.W. were dirty and hungry, that Mark was using methamphetamines, and that Ariel left a pipe and other drug paraphernalia within O.W.'s reach.

The agency conducted a home visit and interviewed Ariel, who was very angry and told the social worker she had been clean for over a year. Ariel refused to take a drug test and refused to wake Mark, who was sleeping, so the social worker could speak to him. Before leaving, the social worker observed E.S. and O.W., noting both appeared clean and healthy with no visible marks or bruises.

Several weeks later, the social worker returned to the home with Mark's probation officer. The house was cluttered with tools, some dangerous, and small plastic bags "consistent with drugs" were found in the home. Also found was drug paraphernalia, including pipes and a scale. Mark admitted using substances and a drug test proved

---

[1]     Neither Ariel nor Mark are a party to this appeal.

2.

positive for methamphetamines, amphetamines, MDMA, and benzodiazepines. Ariel admitted marijuana use, but refused to submit to a voluntary drug test.

During the visit, the social worker interviewed E.S., as well as Ariel's 12-year-old brother who lived in the home. E.S. told the social worker Ariel hit her on her "butt and arms with a closed hand." When E.S. said this, Ariel said E.S. was lying and told E.S. she would have to "live somewhere else." Ariel's younger brother confirmed marijuana was smoked in the home, but denied there was any alcohol use in the home.

In August of 2015, the agency received another referral, this time reporting that the electricity in the home had been turned off. The referring party observed glass methamphetamine pipes and a white substance in the home. The social worker conducted a home visit and found pipes in a locked space, but found a white substance on top of some children's books.

Ariel admitted that the electricity had been turned off for one week. But she denied using methamphetamine and insisted the glass pipes belonged to Mark. Ariel again admitted marijuana use and again refused to submit to a drug test. She did agree to participate in family maintenance services.

That same day, the social worker met with Mark in county jail; Mark had been arrested for assaulting a cousin. He admitted using methamphetamine. Mark refused family maintenance services, but said he would think about it and discuss it with Ariel.

When the social worker called 11 days later to follow-up, Ariel agreed to accept family maintenance services if they were recommended by the assessment. An assessment was scheduled, but could not be completed because Ariel became ill. Mark ultimately refused to accept services because he believed they would interfere with his work. After subsequent attempts to engage Ariel and Mark proved unfruitful, the social worker placed both minors into protective custody.

After placing the minors into custody, the social worker met with father at his mother's home. During the visit, the social worker observed two small pipes on the

3.

coffee table, along with a small propane tank used to smoke the pipes. Father's mother told the social worker the pipes belonged to father, but that he did not really live with her. Father admitted using marijuana, but denied other drug use.

Father confirmed he was E.S.'s father, but had not seen her for about two years. Father had two older daughters (whose birthdates he could not remember) from a prior relationship, but they were not in his care. He had not had contact with them because, according to father, their mother would not allow it.

Both Ariel and father confirmed there had been domestic violence in their relationship. Ariel told the social worker father beat her and twice tried to drown her. When she ended the relationship, father came looking for her with a gun. According to father, he used to have an alcohol problem that led to the violence. He now drank alcohol very rarely. He also informed the social worker he had depression for which he took medication.

Father's criminal history report listed arrests and convictions for public intoxication, petty theft, disorderly conduct, and unreasonable noise. His last arrest was in 2012 for petty theft.

*Section 300 Petition and Detention*

On August 23, 2015, the agency filed a Welfare and Institutions Code[2] section 300 petition alleging the conduct of Ariel, Mark and father all created a substantial risk of harm to E.S. and O.W.[3] Specifically, as to father, the petition alleged father reported that he was aware of Ariel's "heavier drug[]" use and that was why he ended their relationship; he had a violent criminal past fueled by alcohol, but claimed he no longer drank; he claimed he only used marijuana and not other drugs; he had depression and

---

[2] All further statutory references are to the Welfare and Institutions Code unless noted otherwise.

[3] The remaining facts will focus on the findings the court made as to E.S. and father, as they are the only ones at issue here.

4.

took medication for it; and he had two older children not in his care. The petition also alleged that the social worker, while meeting with father, observed two pipes with a small propane tank in the living room belonging to father.

At the August 31, 2015, detention hearing, the juvenile court found a prima facie showing that E.S. was a person coming within the description of section 300, and issued an order of detention. A combined jurisdiction and disposition hearing was scheduled for October 1 and trailed to October 15, 2015.

*First Amended Petition*

Prior to the combined jurisdiction and disposition hearing, the agency filed an amended petition focused on father's conduct. The petition alleged father placed E.S. in substantial risk of serious harm due to: (b-8) his failure to protect E.S. from Ariel when he was aware Ariel was using "heavier drugs"; (b-9) his history of domestic violence between himself and Ariel and the mother of his two older children; (b-10) his marijuana use and the drug paraphernalia found in his home; (b-11) the role of alcohol in his violent past and the agency's concern about his sobriety; (b-12) the fact that he had two older children who were not in his care and whom he had not seen for eight years because their mother, would not allow him contact; and (b-13) his reported diagnosis of depression and schizophrenia, previous reports of him hearing voices, and that he was not currently taking medication because he had run out.

*Jurisdiction/Disposition Hearing*

At the jurisdiction hearing October 15, 2015, father's counsel made an offer of proof that, if called to testify, father would testify that the drug paraphernalia found in his home was for marijuana use only. Father's counsel then argued that allegations b-8 (failure to protect E.S. from Ariel's drug use), b-9 (past history of domestic violence), and b-10 (father's marijuana use), did "not give a sufficient level of nexus" to show a risk to E.S.

5.

Counsel argued further the b-11 allegation (that alcohol had played a role in father's violent past and the agency had concerns about his sobriety), was not sustainable as it did not specifically relate to parenting E.S. In addition, the allegation alleged only a "concern" about alcohol and not a known risk.

As for b-12 (father had no contact with his older children) and b-13 (father had mental illness but was out of medication), counsel argued both were "true statements," but that still did not make them sustainable jurisdictional allegations. Counsel argued that the reason father did not have contact with his older children was speculative. As for the allegation of mental illness, the fact that father had run out of medication did not create a nexus that he placed E.S. at risk.

The agency disagreed, stating that the nexus in the allegations was the "overall concern about violence and substance use, whether it be alcohol, unaddressed alcohol issues, on top of that THC." The agency also described the failure to take prescribed medication for depression and schizophrenia as a "risk factor" in parenting.

The juvenile court found the first amended petition true, based on a preponderance of the evidence, and found the children to be persons described by section 300, subdivision (b). Specifically, as to father, the juvenile court stated it was concerned with the presence of drug pipes in his home; his depression and schizophrenia without medication; his failure to protect E.S. from Ariel, when he knew she was using drugs; and his "anger management or impulse control issues" and prior domestic violence with Ariel.

As for disposition, the juvenile court adopted the findings and recommendations of the agency, adjudged the children dependents of the court, ordered the children placed into suitable placement under the supervision of the agency; found reasonable efforts had been made to prevent or eliminate their removal; and found Ariel and Mark's progress "good" and father's progress "fair." Reunification services were ordered for Ariel, Mark,

6.

and father, and all three were advised that the services could be limited to six months. A six-month review hearing was set for April 7, 2016.

## DISCUSSION

I.     JURISDICTIONAL FINDINGS

Father argues the b-11, b-12, and b-13 allegations in the section 300 petition based on his conduct are insufficient on their face to support the juvenile court's assertion of jurisdiction. He also argues all of the allegations based on his conduct, b-8 through b-13, are not supported by substantial evidence. We disagree.

Where, as in this case, a dependency petition alleged multiple grounds on which the juvenile court may assert jurisdiction over a minor, we may affirm the juvenile court's order finding of jurisdiction if any one of the statutory bases that are enumerated in the petition is supported by substantial evidence. (*Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72.) "For jurisdictional purposes, it is irrelevant which parent created [the] circumstances" triggering jurisdiction. (*In re. I.A.* (2011) 201 Cal.App.4th 1484, 1491 (*I.A.*).) "[A] jurisdictional finding good against one parent is good against both," which is consistent with the dependency law's purpose of protecting children, not prosecuting their parents. (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397; see also *In re Briana V.* (2015) 236 Cal.App.4th 297, 308.)

Here, the juvenile court found true allegations that Ariel placed E.S. at risk of harm due to her ongoing substance abuse issues. For this reason, we may decline to address the evidentiary support for any remaining jurisdictional findings. (*I.A., supra,* 201 Cal.App.4th at p. 1492),

Father concedes that E.S. will remain a dependent of the court on account of those findings, regardless of how we decide his appeal. Father nevertheless asks us to review his challenges on the merits, asserting we may exercise our discretion to do so under *In re Drake M.* (2012) 211 Cal.App.4th 754, which holds a reviewing court may consider one parent's challenge to a jurisdictional findings where the challenged finding "(1) serves as

7.

the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*Id.* at pp. 762-763; see also *In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.)

Here, father's challenge to the jurisdictional findings is speculative, at best, suggesting the findings may prejudice him in future dependency proceedings when he "will likely seek placement at some point" of E.S. In supplemental briefing, father challenges the dispositional order removing E.S. from his custody (although he does not challenge the sufficiency of the order). Because he makes this supplement claim, father contends his argument contesting the jurisdictional findings in his opening brief must be addressed on the merits.

To foreclose any other auxiliary claims, we will address why father's contention of error as to the jurisdictional findings will not succeed.

"'""A dependency proceeding under section 300 is essentially a bifurcated proceeding." [Citation.] First, the court must determine whether the minor is within any of the descriptions set out in section 300 and therefore subject to its jurisdiction.' [Citation.] '"The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child who is the subject of a petition comes under the juvenile court's jurisdiction."' [Citation.] 'The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.'" (*In re A.S.* (2011) 202 Cal.App.4th 237, 243-244 (*A.S.*))

When sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) We review the entire record to determine whether substantial evidence supports the juvenile court's findings,

8.

resolving all conflicts and drawing all reasonable inferences in support of the findings. (*Ibid.*) Those inferences "must be reasonable and logical; 'inferences that are the result of mere speculation or conjecture cannot support a finding [citations].'" (*In re B.T.* (2011) 193 Cal.App.4th 685, 691 (*B.T.*).) "We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. The appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 135-136.)

Section 300, subdivision (b), provides a basis for juvenile court jurisdiction if the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the parent's failure to adequately supervise or protect the child or to provide adequate medical treatment. (See *A.S., supra,* 202 Cal.App.4th at p. 244.) In enacting section 300, the Legislature intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194-196.)

"The three elements for jurisdiction under section 300, subdivision (b) are: '"(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the [child], or a 'substantial risk' of such harm or illness."' [Citations.] 'The third element, however, effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).'" (*B.T., supra,* 193 Cal.App.4th at p. 692, italics omitted.) "[P]revious acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur." (*In re Ricardo L.* (2003)

109 Cal.App.4th 552, 565 (*Ricardo L.*).) Past conduct is probative "if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.)

Father claims there is no sufficient nexus between his past conduct and the risk of harm posed to E.S. at the time of the jurisdictional hearing in the dependency proceeding. He argues there was insufficient evidence to support the b-8 allegation that he posed a current risk of harm to E.S. due to his failure to protect E.S. from Ariel's drug use in 2012 and 2013. Father admits he was aware of Ariel's drug use in 2012 or 2013, but argues he had not seen E.S. for two years and was no longer in a relationship with Ariel. He further argues that, during that two-year time frame when he was not part of their lives, the agency became involved with Ariel and the children and eventually dismissed services, suggesting any risk father had failed to protect E.S. was resolved.

Father argues that the evidence was insufficient to support the b-9 allegation that his prior acts of domestic violence created a current and substantial risk of harm to E.S. While father acknowledges past domestic violence against Ariel, he again argues he had not been in a relationship with Ariel for at least two years and there was no evidence any domestic violence between himself and Ariel was ongoing or likely to reoccur.

Father argues that the evidence was insufficient to support the b-10 allegation that his marijuana use or having drug pipes in his home, without more, placed E.S. at risk of harm because there is no evidence he was using marijuana when he last saw E.S. or that any past marijuana use harmed E.S.

Father argues that the evidence was insufficient to support the b-11 allegation that his past criminal history and past abuse of alcohol created a current risk of harm to E.S., noting that none of his criminal history reflected a violent criminal history and none of his documented arrests were for child abuse or neglect.

Father next argues that the evidence was insufficient to support the b-12 allegation that the lack of contact in eight years with his two older children or the fact that there was domestic violence between himself and the mother of his older children created a current

10.

risk of harm to E.S. Father contends the reason he did not have contact with his two older children was speculative. He also contends there was no evidence of any ongoing domestic violence in any of his current relationships.

Father finally argues that the evidence was insufficient to support the b-13 allegation that his depression and schizophrenia and the fact that he had not taken medication because he ran out created a current risk of harm to E.S.

Here, while father had not had or sought contact with E.S. for the past two years, and the agency did not have current information regarding his relationship with E.S. or his current parenting skills, his past behaviors, his attitude towards them, and his current circumstances are telling. Even though father, while in a relationship with Ariel, knew Ariel was using "heavier drugs," and which, by his own account, caused the breakup of their relationship, father did nothing to obtain custody of E.S. While father claimed he got the paperwork to do so, he did not fill it out because he "isn't good at filling out papers." The only time father had seen E.S. was when one of Ariel's friends brought E.S. to him. He also acknowledged he had two older children, whose birth dates he could not recall, with whom he was not involved. Father himself stated he "give[s] up eas[ily] on things" when he gets hurt.

Father was equivocal about his own drug and alcohol use. He acknowledged marijuana use in his previous relationship with Ariel and also that he smoked marijuana to cope with stress, pain and anxiety. He then reported that he no longer smoked marijuana, although he tested positive for it. Father's mother reported that the smoking pipes and propane tank used to smoke the pipes seen in her home during the current dependency case belonged to father. As for alcohol, father stated he had had an alcohol problem that made him violent but that he no longer drank. But he also stated he now drank "once in a blue moon." As for his self-acknowledged mental health issues, father's failure to take prescribed medication, for whatever reason, is disconcerting.

Father acknowledged domestic violence in his relationship with Ariel, but claimed it stemmed from Ariel's desire to use "other drugs," which he was opposed to. Ariel described her relationship with father as starting when she was 14 and he was 25. Father provided Ariel with marijuana and, during their relationship, he was manipulative and forcibly held her against her will. She reported father beat her and attempted to drown her on two separate occasions. When she ended the relationship, she did so by "escaping" to a friend's and hiding. Father continued to search for her with a gun. Father also acknowledged to the social worker that his relationship with the mother of his two older children ended due to domestic violence and his anger and depression issues. When asked whether he had current anger management issues, father shifted the blame and stated his anger was not an issue "as long as he stays away from people who are ignorant." The juvenile court had before it evidence that, during the pendency of this case, father became loud and disruptive in the lobby of the drug testing facility and was told he would not be allowed entry if he behaved inappropriately.

At the time of the jurisdiction hearing, father was homeless and, at age 30, had a total work history of three months. He survived by staying at his mother's and at friends' homes.

"'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' [Citation.]" (*Ricardo L., supra,* 109 Cal.App.4th at p. 565.) Thus, as previously noted, past conduct, standing alone, does not establish a substantial risk of harm, "there must be some reason beyond mere speculation to believe they will reoccur. [Citations.]" (*Ibid.*; *In re James B.* (1986) 184 Cal.App.3d 524, 529-530 [jurisdiction is necessary if parent is unwilling or unlikely to protect children against threat of similar harm in the future], superseded by statute on other grounds in *In re David H.* (2008) 165 Cal.App.4th 1626.)

In sustaining the section 300, subdivision (b) allegations in the instant proceeding, the juvenile court had before it overwhelming evidence that father's past and current conduct likely placed E.S. at substantial risk of harm and we reject his claim to the contrary.

## II.     DISPOSITIONAL ORDER

In supplemental briefing, father contends the juvenile court erred when it removed E.S. from his care pursuant to section 361, subdivision (c)[4], because he was a noncustodial parent.  Father contends the juvenile court's finding removing E.S. from his custody under this statute, which he claims does not apply to him, will prejudicially affect him on the issue of placement in the future.

Father's argument is confusing, at best.  When a juvenile court removes a child from a custodial parent, in this case mother, it must first make a determination concerning a possible noncustodial parent under section 361.2, in this case father.  That section provides, in pertinent part, that "[w]hen a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child."  (§ 361.2, subd. (a).)  If there is and if that parent requests custody, "the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (*Ibid.*)  It is the noncustodial parent's request for custody that triggers application of section 361.2, subdivision (a); where the noncustodial parent makes no such request, the

---

**4**     Section 361, subdivision (c)(1) provides that a juvenile court may not take a dependent child from the physical custody of his or her parents with whom the child resided at the time the petition was initiated, unless there is clear and convincing evidence of a substantial risk of harm to the child.

13.

statute is not applicable. (*In re V.F.* (2007) 157 Cal.App.4th 962, 971, superseded by statute as stated in *In re Adrianna P.* (2008) 166 Cal.App.4th 44, 57-58.)

In comparison, when a juvenile court orders a child removed from parental custody under section 361, it must find clear and convincing evidence that, if the child were returned home, there is or would be "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" and that there is no reasonable means to protect the child without removal. (§ 361, subd. (c)(1).)

Here, father was silent at disposition as to whether he was seeking custody of E.S. In his supplemental brief, he acknowledges that he did not request placement of E.S. at disposition and did not ask to be assessed under section 361.2. As argued by father, the juvenile court erred when it removed E.S. from his custody under a statute not applicable to him (§ 361), but he does not argue the juvenile court should have instead made the assessment under the statute dealing with noncustodial parents (§ 361.2). Nor does he suggest any applicable statute. Father cites no authority for his contention, but argues only that he should "not be stuck with an assessment of placement that was not made as a result of his request, but was made because the court misapplied the statute."

Father acknowledges that the general rule in dependency proceedings that a parent who fails to raise an issue in the juvenile court is precluded from raising that issue on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Here, father is not challenging the sufficiency of the removal order, but the order itself. In essence, father is raising a purely legal issue of whether the language of section 361, subdivision (c), which the juvenile court used here to remove E.S. from father's custody, is applicable to a noncustodial parent when that noncustodial parent does not request custody. The language of section 361, subdivision (c) states that it applies to the parent "with whom the child resides at the time the petition was initiated …."

Father requests that we address this purely legal question because it is "an important legal issue for which some clarification may be useful for lower courts." We decline to address this claim, which is neither properly raised nor sufficiently briefed.[5]

**DISPOSITION**

The orders are affirmed.

_____
                                                                          FRANSON, J.

WE CONCUR:


_____
HILL, P.J.


_____
MCCABE, J.[*]

---

**5**      On September 9, 2016, father filed a supplemental letter citing new case authority, *In re Andrew S.* (2016) 2 Cal.App.5th 536 (*Andrew S.*), in support of his argument that the juvenile court erred when it removed E.S. from his custody pursuant to section 361, because father was a noncustodial parent. However, we find *Andrew S.* does not help father's argument. Unlike father here, the jurisdictional findings against the parent in *Andrew. S.* were unsubstantiated and the parent requested custody of the minor, making section 361.2 applicable.

[*]      Judge of the Merced Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.